[635 NYS2d 824]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ERIC SMITH, Appellant.

Fourth Department, November 15, 1995

224

[redacted]

[redacted]

[redacted]

[redacted]

## APPEARANCES OF COUNSEL

*Kevin Bradley*, Canisteo, for appellant.

*John C. Tunney, District Attorney* of Steuben County, Bath (*John Cirando* of counsel), for respondent.

## OPINION OF THE COURT

Denman, P. J.

Defendant, Eric Smith, was convicted following a jury trial of intentional murder for the strangulation and bludgeoning of

four-year-old Derrick Robie on August 2, 1993, in Savona, New York, a crime committed when defendant was 13 years old. Defendant was sentenced to the maximum indeterminate term of nine years to life, which he is serving at a facility operated by the State Division for Youth. On this appeal, we are called upon to decide whether defendant's oral and written statements to police should have been suppressed as involuntarily made; whether the jury's finding that defendant was criminally responsible for his actions is against the weight of the evidence; whether the People failed to rebut beyond a reasonable doubt the common-law presumption that a 13 year old is not criminally responsible; whether the court erred in instructing the jury on the defense of lack of responsibility by reason of mental disease or defect; whether reversal is required as a result of the court's admission of evidence concerning the victim's personality; whether the court improperly denied removal of the case to Family Court; and whether the sentence is harsh and excessive. We conclude that none of defendant's contentions requires reversal and that the judgment of conviction therefore should be affirmed.

## Factual Background

According to evidence adduced at the *Huntley* hearing and at trial, at 9:12 A.M. on Monday, August 2, 1993, four-year-old Derrick Robie, carrying his lunch in a canvas bag, left his home to walk to a nearby park to participate in a recreation program. Several minutes later, on McCoy Street near the park, defendant, who was riding his bicycle, encountered Derrick, whom he knew from the recreation program. According to the oral and written statements defendant gave to police one week later, defendant called out, "Hey, kid," prompting Derrick to turn around, at which point defendant "knew I wanted to take him someplace and hurt him." Defendant asked Derrick if he wanted to go to the recreation program by way of a "short cut," but Derrick said that he wasn't "supposed to." Defendant repeatedly assured Derrick, "It's okay, I'm right here," then got off his bicycle and led Derrick through a wooded vacant lot adjacent to the park. As the boys reached a secluded area behind an overgrown hedgerow, defendant put down his bicycle, let Derrick go ahead of him and then reached around and choked Derrick's neck with his right arm. Derrick dropped his lunch bag and kicked his feet and swung his fists in an attempt to get away. Defendant started to release Derrick in order to readjust his grip and choke Derrick with his hands, but

because Derrick began to "gasp some air," defendant "squeezed harder." After about 30 seconds, Derrick no longer made any noise, so defendant "figured he was dead" and laid him on the ground. When Derrick again began "gasping for air", defendant dumped Derrick's lunch on the ground, picked up a paper napkin, and stuffed it in Derrick's mouth. Defendant then attempted to stuff a plastic sandwich bag in Derrick's mouth, but pulled it out when Derrick bit defendant's finger. Defendant picked up a small rock, kneeled over Derrick, and struck him with it three times on the right side of the head; picked up a large rock and, with both hands, threw it three times on Derrick's head; then picked up another large rock and threw it twice onto Derrick's chest and once onto his midsection. At that point, defendant took the drink from Derrick's lunch and poured it on Derrick's face. He then pulled down Derrick's pants, took a stick, flipped over Derrick's body, and "put the stick up his butt." Defendant flipped over the body again, dragged it several feet to a rockpile, and left the area on his bike. After about five minutes, defendant returned to the scene to check the body. As defendant subsequently related to police, he wanted to "double, triple check to make sure" that the victim was dead: "I was worried if he wasn't there he might say something however I figured if he's dead, and I believed he was, I won't have to worry about anything." Defendant then left the scene.

Derrick's mother, concerned when Derrick did not return home from the park, reported him missing at approximately 11:00 A.M. Derrick's body was found at approximately 3:45 P.M. The State Police immediately took charge of the investigation and catalogued the physical evidence, details of which were not released to the public. An autopsy revealed severe head injuries, including multiple skull fractures and cerebral swelling and contusions, extensive tearing and bleeding of tissues in the chest, a perforation of the intestinal wall, and pinpoint hemorrhages on the neck, face, and eyes, indicative of asphyxiation. The cause of death was determined to be blunt trauma to the head with contributing asphyxia. Over the course of the next several days, police interviewed approximately 500 witnesses, many more than once. Police spoke with defendant on the morning of Thursday, August 5, when defendant and his mother walked into the police command post to offer information that defendant's mother thought might be helpful in the investigation. Defendant revealed that he had been in and out of the park three or four times that morning, but stated that he had not seen Derrick.

At about 5:00 P.M. on August 5, investigators went to the home of defendant and interviewed him, with the permission of his parents, to clarify some minor discrepancies between defendant's statements and those of other witnesses. During that interview, which lasted 45 to 50 minutes, defendant revealed for the first time that, while riding on McCoy Street that morning, he had seen Derrick walking on the opposite side of the street, near the murder scene. Defendant described Derrick's clothing and lunch bag in close detail. The police had defendant perform an impromptu vision examination, but defendant couldn't see well because he didn't have his glasses, which had broken several weeks earlier. When the officers became skeptical that defendant could have seen such details from across the street, defendant became emotional and spontaneously asked, "You think I killed him, don't you?", to which police responded, "No." When police asked defendant if he had seen anything else, defendant said, "I'm not the type of person that would kill, hurt, or sexually molest anyone." The interview ended when defendant's great-grandfather, a retired Sheriff's deputy, asked that the officers leave.

Approximately an hour later, at 7:00 P.M., State Police investigators, accompanied by District Attorney Tunney, returned to defendant's home to ask if they could resume the interview. The officers assured defendant's great-grandfather, who had assumed the role of defendant's protector, that they were not accusing defendant, but merely trying to acquire accurate details from him, since he was the last known person to have seen Derrick alive. Ultimately, police persuaded the family to allow defendant to accompany them to McCoy Street, so that defendant could reenact his movements and observations on the day of the murder. During the reenactment, defendant pointed out where he had seen Derrick, but could make out only the outline of an investigator playing the role of Derrick. Because it was getting dark, the parties agreed to return the next day to reenact the scene.

The next morning, defendant and his great-grandfather accompanied the police to McCoy Street to reenact the scene, and the reenactment was videotaped. Again, there were problems with defendant's account because defendant described others' movements inconsistently and was unable to see or describe an object carried by the officer portraying Derrick. The officers questioned whether defendant really had seen Derrick, and said they needed to know before wasting time pursuing a false lead. Investigators subsequently interviewed defendant

for two hours at the command post in the presence of defendant's great-grandfather. During the interview, defendant equivocated concerning whether he had seen Derrick. At the end of the interview, police still were not sure that defendant had seen Derrick.

Police had no contact with defendant or his family on August 7. On Sunday afternoon, August 8, defendant told his mother, grandfather, and great-grandfather that he had killed Derrick. Through an intermediary, defendant's great-grandfather arranged a meeting with District Attorney Tunney at the Steuben County Office Building in Bath. Defendant's great-grandfather sought to handle the matter as "peaceful and as quiet as we can," and specifically asked to avoid the involvement of the State Police, the prospect of public arrest, and the possibility of a Grand Jury proceeding or other preliminaries. The District Attorney persuaded defendant's great-grandfather that the State Police, in the person of BCI Captain DeLap, had to take defendant's statement. The District Attorney called for DeLap to come to the District Attorney's office, and defendant's great-grandfather called his family to have defendant brought there. Defendant was taken to the office by his mother, stepfather, and grandfather shortly after 10:00 P.M. The family decided that only defendant's stepfather and great-grandfather would stay with defendant while he was being questioned by DeLap. The District Attorney left the room before the interview began because, as he earlier had explained to defendant's great-grandfather, he would have to prosecute the case and did not want to witness the statement. By all accounts, the authorities never promised that defendant would not be prosecuted criminally, but merely acknowledged to defendant's family that defendant needed psychiatric help and would be evaluated within a few days.

At the outset of the interview, DeLap sat directly across from defendant and explained the ground rules of the questioning, specifically that defendant must speak the truth and that his family would not be permitted to interrupt. DeLap at one point told defendant, "You have to answer for this." DeLap gave defendant his *Miranda* warnings, explaining them in detail: "You have the right to remain silent * * * [T]hat means you don't have to talk to me * * * Furthermore, that is only the first part of that. If you give up the right to remain silent, anything you say, good or bad, can be used in a court of law or used anywhere against you. If it goes against you, so be it * * * That means you don't have to talk to me and if you do and it

goes against you, so be it, but it will be the truth so it's not bad * * * [A]lso you have the right to an attorney * * * You have a right to a lawyer. That means you have the right to a lawyer right now. We can stop right now and you can go buy a lawyer, have yourself a lawyer. If you can't afford one or your mom and dad can't afford one because they don't work or [are] out of work, whatever the case may be, one will be appointed to represent you before any questions."

Defendant asked only one question: what an attorney was. DeLap told him that an attorney was a lawyer. At each step of the warnings, DeLap asked defendant, his stepfather, and great-grandfather if they understood the warnings. In response to each query, defendant nodded or said he understood. Similarly, defendant's stepfather and great-grandfather indicated their understanding of defendant's rights and their agreement that defendant would waive them and agree to talk to DeLap.

Over the next three hours, defendant gave his account of the murder, the details of which dovetailed with the physical evidence found at the scene. At no time did either defendant or his family ask to stop the interview or request a lawyer. Ultimately, defendant's confession was typed as DeLap dictated from his interview notes. Defendant suggested a minor change to the statement, initialed each page, and then signed the statement, as did each of the adults present.

Defendant was indicted in September 1993 on a single count of murder in the second degree. In October 1993, defendant moved for suppression of his oral and written statements to police on the grounds that the statements were elicited in violation of his *Miranda* rights and were otherwise involuntary. The People opposed the motion and a *Huntley* hearing was conducted. By order entered February 14, 1994, County Court denied defendant's motion to suppress in all respects. In May 1994, the defense moved pursuant to CPL 210.43 for removal of the proceeding from criminal court to Family Court. In support of the motion, the defense alleged that the case was an exceptional one warranting removal because psychological evidence revealed that defendant's act was the result of a lifelong mental disease—a pathological rage disorder. The People opposed the motion. By order entered June 7, 1994, County Court denied defendant's application for removal to Family Court. The court stated that it doubted that it had the power to remove the indictment in the absence of consent by the District Attorney; nevertheless, the court considered the merits of

defendant's arguments in light of the statutory factors (see, CPL 210.43 [2]), and concluded that, because of the seriousness of the offense, the strong evidence of guilt, the need for such act to be punished under the Penal Law, and the need for public scrutiny of the proceeding, this was not one of the "rare" cases in which removal was warranted.

At the trial in July and August 1994, the People's direct case consisted primarily of defendant's confession. The primary defense was that defendant lacked criminal responsibility by reason of mental disease or defect (see, Penal Law § 40.15). The defense put on a number of lay and expert witnesses who testified about defendant's physical, developmental, intellectual, and emotional difficulties. Based on his review of defendant's background and his interviews with defendant, defendant's expert psychiatrist, Stephen T. Herman, M.D., testified that, at the time of the crime, defendant was suffering from a mental disease or defect, namely, Intermittent Explosive Disorder and Dysthymic Disorder (low grade depression), that rendered him unable to control his rage and unable to understand or appreciate the nature and consequences of his actions. In rebuttal, the People presented several lay witnesses whose testimony tended to show that defendant was not prone to rage, and who contradicted certain facts forming the basis for Dr. Herman's opinion. Moreover, the People's expert psychiatrist, Kathleen M. Quinn, M.D., opined, based on her review of defendant's history and her examinations of defendant, that defendant did not suffer from Intermittent Explosive Disorder or any other mental disease or defect, that he did not lose control at the time of the crime, and that he did not lack the capacity to appreciate the nature and consequences of his conduct.

The jury convicted defendant, as charged, of murder in the second degree. Defendant subsequently was sentenced to the maximum term of nine years to life.

## Defendant's statements were voluntarily made.

Defendant contends that his oral and written statements should have been suppressed on the ground that, under the totality of the circumstances, they were involuntarily made. Defendant contends that Captain DeLap omitted significant portions of the required preinterrogation warnings, distorted other portions of the warnings, and failed to elicit an unequivocal, knowing, intelligent, and voluntary waiver of defendant's *Miranda* rights.

A statement made by defendant in response to custodial interrogation is inadmissible absent a showing by the prosecu-

tion that defendant received prescribed warnings designed to dispel the compulsion inherent in custodial surroundings and hence preserve a suspect's right against compulsory self-incrimination (*see, Michigan v Mosley*, 423 US 96, 99-100; *Miranda v Arizona*, 384 US 436, 444, 458). The rule does not require a ritualistic incantation of warnings in any particular language or form (*California v Prysock*, 453 US 355, 359). Where defendant is properly warned, he may "waive effectuation" of his rights, provided the waiver is made voluntarily, knowingly and intelligently (*Miranda v Arizona, supra,* at 444; *see, People v Williams*, 62 NY2d 285, 288-289). In determining the admissibility of defendant's statements, the court must examine the totality of the circumstances surrounding the giving of the statement in order to ascertain whether defendant knowingly, intelligently, and voluntarily waived his rights (*Fare v Michael C.*, 442 US 707, 725, 728; *Matter of Stanley C.*, 116 AD2d 209, 213-214; *People v Miles*, 115 AD2d 962, 963, *lv denied* 67 NY2d 654).

■ It is well settled that the possibility of a knowing, intelligent, and voluntary waiver of *Miranda* rights is not precluded merely because the suspect is a juvenile (*see, Fare v Michael C., supra,* at 725; *People v Stephen J. B.*, 23 NY2d 611, 616-617; *Matter of Julian B.*, 125 AD2d 666, 671 [Kooper and Spatt, JJ., concurring]). Nevertheless, " 'special care must be taken to insure the rights of minors who are exposed to the criminal justice system' " (*People v Ventiquattro*, 138 AD2d 925, 927, quoting *People v Ward*, 95 AD2d 351, 354). "Thus, '[i]t is well recognized that over and beyond the ordinary constitutional safeguards provided for adults subjected to questioning, the police must exercise greater care to insure that the rights of youthful suspects are vigilantly observed' " (*People v Ventiquattro, supra,* at 927, quoting *People v Hall*, 125 AD2d 698, 701; *see also, People v Gotte*, 150 AD2d 488, *lv denied* 74 NY2d 896; *Matter of Julian B., supra,* at 669 [Kooper and Spatt, JJ., concurring]; *People v Ward, supra*). That heavier burden follows as a matter of course from recognition that the *Miranda* warnings, and the protections intended to be afforded by them, are meaningless unless they are understood (*see, Matter of Julian B., supra,* at 670 [Kooper and Spatt, JJ., concurring]; *see also, People v Williams, supra,* at 289). Thus, the court should carefully scrutinize the circumstances to determine whether the interrogator reduced the warnings to terms that the juvenile suspect could understand and whether the suspect in fact understood the warnings (*cf., People v Williams, supra,* at 289-290 [case of illiterate, borderline mentally retarded 20 year old

who suffered from organic brain damage]). Nevertheless, it is neither the duty nor function of police to provide a suspect with a general legal education; all that is required is for the suspect to grasp the essential elements of his *Miranda* rights and the immediate import of those rights on the custodial interrogation process (*see, People v Williams, supra*, at 287, 289-290; *Matter of Julian B., supra*, at 670 [Kooper and Spatt, JJ., concurring]).

With those principles in mind, we turn to defendant's challenges to the statements made to Captain DeLap. Defendant argues that DeLap omitted a significant portion of the warnings, viz., the phrase "and will" from the assertedly required warning, "anything said can and will be used against you in a court of law." We reject that contention. As noted, there is no constitutionally prescribed form for the warnings (*see, California v Prysock, supra; People v Swift*, 32 AD2d 183, 187, *cert denied* 396 US 1018) and the New York State Legislature, in prescribing warnings to be given to juveniles, has omitted the language in question *(see,* Family Ct Act § 305.2 [7] [b]).

■ Defendant further contends that DeLap neglected to inform him that he had "the right to have a lawyer during interrogation." The warnings given by DeLap clearly informed defendant that he had a right to a lawyer: "That means you have the right to a lawyer right now. We can stop right now and you can go buy a lawyer, have yourself a lawyer * * * [or if you and your parents can't afford one] one will be appointed to represent you before any questions." That certainly conveyed the gist of the required warning in terms more likely to be understood by defendant than the standard *Miranda* language.

■ Defendant mounts a number of other challenges to language either used or omitted in the warnings given by DeLap, in large part directed to DeLap's attempts to couch the warnings in terms understandable by a juvenile suspect. Those challenges are baseless, but one merits analysis. Defendant argues that he should have been told explicitly that he faced criminal prosecution. Under the holding of *People v Williams (supra*, at 287), the police need only take steps to assure the suspect' s understanding of the *Miranda* warnings and their relation to the interrogation, and need not cure the suspect's "ignorance of the mechanics by which the fruits of that waiver may be used later in the criminal process" (*People v Williams, supra*, at 289). Here, DeLap unequivocally informed defendant that anything he said could "be used in a court of law or used anywhere against you." Contrary to defendant's assertion, the

record does not contain a scintilla of evidence that defendant and his family were misled into believing that defendant would not be prosecuted as an adult. Defendant's great-grandfather, who acted as defendant's spokesman and chief protector throughout, necessarily understood the potential for, if not the certainty of, criminal prosecution. He asked the District Attorney if the matter could be handled without involving the State Police, and without Grand Jury or other preliminary proceedings. Moreover, the District Attorney told defendant's great-grandfather that he did not want to be present during defendant's interrogation because he would be prosecuting the case. Additionally, DeLap told defendant, in the presence of his family, "You have to answer for this."

■ Finally, defendant argues that he did not unambiguously indicate that he understood and waived his *Miranda* rights. To the contrary, the record reveals that DeLap was scrupulously careful to explain the *Miranda* warnings, to ascertain defendant's understanding of those rights, and to elicit defendant's affirmative, knowing, intelligent, and voluntary waiver of each of those rights. It is important to note that the interrogation was initiated by defendant's family and that no effort was made to insulate defendant from his family, which fact alone distinguishes this case from those relied upon by defendant. Defendant's stepfather and great-grandfather were present throughout the interrogation and verbally indicated their understanding and agreement. In any event, an explicit verbal waiver is not required; an implicit waiver may suffice and may be inferred from the circumstances (*see, North Carolina v Butler*, 441 US 369). The question " 'is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived' " his *Miranda* rights (*Fare v Michael C., supra*, at 724, quoting *North Carolina v Butler, supra*, at 373). The record establishes that he did.

### The jury's rejection of the defense of mental disease or defect is not against the weight of the evidence.

The parties introduced conflicting expert testimony concerning whether defendant was not criminally responsible by reason of a mental disease or defect that deprived him, at the time of the crime, of substantial capacity to know or appreciate the nature and consequences of his conduct. Defendant did not contend that he lacked substantial capacity to know or appreciate that his conduct was wrong.

When there is conflicting expert evidence on the issue of criminal responsibility, the jury is generally free to accept or

reject, in whole or in part, the opinion of any expert, at least in the absence of a " 'serious flaw' " in the expert's testimony (*People v James*, 191 AD2d 957, 958, *lv denied* 82 NY2d 720, *cert denied* 510 US 1077; *People v Enchautegui*, 156 AD2d 461, *lv denied* 76 NY2d 787). When a defendant contends that the verdict is against the weight of the evidence, this Court must determine, based on an independent review of all the credible evidence, whether a different finding would have been reasonable (*see, People v Bleakley*, 69 NY2d 490, 495). If so, "then the appellate court must, like the trier of fact below, 'weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony' [citations omitted]. If it appears that the trier of fact has failed to give the evidence the weight it should be accorded, then the appellate court may set aside the verdict" (*People v Bleakley, supra,* at 495).

■ In essence, defendant asserts that he was entitled to a directed verdict finding that he was not criminally responsible by reason of mental disease or defect (*see, People v Barnes*, 98 AD2d 977). We decline to so find. Even assuming, arguendo, that such finding would not have been unreasonable (*see, People v Bleakley, supra*), we nonetheless determine that the jury did not fail to give the conflicting expert evidence the weight it should have been accorded. The opinion of Dr. Quinn that defendant does not have the "Intermittent Explosive Disorder" diagnosed by the defense psychiatrist is well supported by defendant's background, medical and educational records, and recent psychiatric examinations. There is no history of extreme aggression or loss of control supporting Dr. Herman's conclusion that defendant, in response to stress, would enter a disassociative state in which he could neither control his anger nor understand the nature and consequences of his conduct. Although such lack of history presents the possibility that defendant's conduct in killing Derrick represented the acute onset of a mental disease, that theory was specifically eschewed by the defense psychiatrist.

Moreover, the defense was undermined by independent proof contradicting several assumptions about defendant's background relied upon by Dr. Herman in forming his diagnosis and opinion. Dr. Herman's opinion was undercut further by the concession on cross-examination that defendant saw an opportunity to harm Derrick because there was no one else

around, but that defendant could have "chosen" to control his anger if others had been around. Dr. Herman additionally conceded that defendant was sadistic, which Dr. Herman defined to mean intentionally cruel, and that a sadistic person, in order to derive pleasure from being cruel, must be consciously aware of his cruelty.

In any event, we conclude that the jury was entitled to conclude, from the deliberate and calculating nature of the killing and defendant's attempts at concealment, that defendant had the substantial capacity to understand and appreciate the nature and consequences of his conduct. Defendant described how, when he first saw Derrick, he "knew" he "wanted to take him someplace and hurt him." Defendant repeatedly entreated Derrick to follow him through the woods until they reached a place that defendant knew would be concealed from passersby. Defendant tightened his choke hold, stuffed objects in the victim's mouth, and repeatedly bludgeoned the victim in response to the victim's "gasping for air." Subsequently, defendant left the scene for several minutes but returned to make sure the victim was dead. That conduct reveals not only that defendant was in control of his actions, but also that he had a full understanding and appreciation of their nature and consequences. On this record, the jury was entitled to reject the defense of lack of criminal responsibility (see, People v Wood, 12 NY2d 69, 77; People v James, supra; People v Enchautegui, supra).

## The common-law presumption of
## doli incapax is inapplicable.

Defendant argues that his conviction must be reversed on the ground that the prosecution failed to rebut beyond a reasonable doubt the common-law presumption of doli incapax, under which a child between the ages of 7 and 14 is presumed to lack sufficient discretion and intelligence to distinguish between right and wrong and hence is presumed to be not criminally responsible for his actions (see generally, Matter of Robert M., 110 Misc 2d 113, 116, n 14; Black's Law Dictionary 433 [5th ed 1979]). Defendant contends that the common-law rebuttable presumption remains applicable in New York by virtue of article I, section 14 of the New York State Constitution of 1938, which provides: "Such parts of the common law * * * as * * * did form the law of [the colony of New York at the time of the American Revolution] * * * shall be and continue [sic] the law of this state, subject to such alterations as the legislature shall make concerning the same."

■ The obvious flaw in defendant's argument is that the Legislature has displaced the common-law doctrine of doli incapax with the provisions of Penal Law § 30.00 (*see, People v Ryals*, 100 Misc 2d 551, 552). That statute provides generally that "a person less than sixteen years old is not criminally responsible for conduct" (Penal Law § 30.00 [1]), but provides, among several exceptions, that a "person thirteen, fourteen or fifteen years of age is criminally responsible for acts constituting murder in the second degree as defined in subdivisions one and two of section 125.25" of the Penal Law (Penal Law § 30.00 [2]; *see, People v De Lage*, 65 AD2d 626). Because the common-law presumption has been abolished by act of the Legislature, the People were not required to rebut it. The People were required merely to prove beyond a reasonable doubt that defendant formed the specific intent to kill (*see*, Penal Law § 15.05 [1]; § 125.25 [1]; *cf., Matter of Robert M., supra*, at 116), and the proof was sufficient to establish that element.

## The court's instructions were not erroneous.

■ Over objection, the court instructed the jurors, in connection with the defense that defendant lacked substantial capacity to know or appreciate the nature and consequences of his conduct, that, "by consequence, the law means the potential for harm of his conduct." The court charged, "[D]id defendant know and appreciate the consequences of his conduct? Was he able to understand these acts would result in harm or cause death to another person?" Defendant contends that the court's charge should have been "crime-specific", in other words, that the jurors should have been restricted to finding whether defendant lacked substantial capacity to appreciate that he was "killing a little boy." We find no error in the court's charge. It conforms almost precisely to an instruction impliedly approved by the Court of Appeals (*see, People v Adams*, 26 NY2d 129, 135, *cert denied* 399 US 931) and subsequently adopted as a model charge (*see*, 1 CJI[NY] 40.15, at 965T).

■ Defendant additionally contends that the court erred in repeatedly employing the words "insanity" or "legal insanity" as a substitute for the concept of lack of criminal responsibility by reason of mental disease or defect (*see*, Penal Law § 40.15). We decline to indulge defendant's assumption that the jury was confused by the court's use of the time-honored terminology. The court's charge conformed to the model charge (*see*, 1 CJI[NY] 40.15, at 965N-965W), which explicitly authorizes the use of the phrases "legally insane" or "legal insanity" as con-

venient shorthand for the affirmative defense. It would be awkward for the court continually to use the unwieldy phrase "lack of responsibility by reason of mental disease or defect." Courts and commentators have long used the terminology interchangeably, and have done so with complete accuracy and no apparent confusion (*see, e.g., People v Kohl*, 72 NY2d 191, 195-200; *People v Shawcross*, 192 AD2d 1128, 1129, *lv denied* 82 NY2d 726; Donnino, Practice Commentary, McKinney's Cons Laws of NY, Book 39, Penal Law § 40.15, at 140-145)

### The admission of irrelevant testimony concerning the victim constitutes harmless error.

On their direct case, the People called the victim's mother as a witness for the purpose of depicting the victim in sympathetic terms. Over defense objection, the victim's mother was permitted to answer two questions concerning the victim's personality and disposition. Defense counsel renewed his objection, whereupon the court cut off that line of questioning and restricted the witness' testimony to two areas of background: parental instructions to avoid strangers and the victim's movements on the morning of the crime. The court denied defense counsel's motion to strike the testimony concerning the victim's personality, but granted defense counsel's request for a curative instruction. The court reminded the jurors:

"You had assured the Court and counsel that you would proceed setting aside your natural sympathies, those natural sympathies being for those charged with a serious crime no matter the age, and further, with regard to any victim of the crime no matter the age.

"I want to indicate again that is your obligation * * * [T]he testimony here is limited and will be used in some probative manner relative to this matter and not elicited solely for the purposes of sympathy."

We agree with defendant that the court erred in allowing, and later in refusing to strike, irrelevant testimony concerning the victim's personality, which had no tendency to prove any material fact in issue (*cf., People v Stevens*, 76 NY2d 833, 836; *People v Caruso*, 246 NY 437, 443). We nonetheless conclude that the court minimized the potential prejudicial impact of such testimony by giving a prompt curative instruction to the effect that the jurors must set aside their natural sympathies. In the case of an error of nonconstitutional dimension, the error is deemed to be prejudicial and to require reversal only if there is a "significant probability" that the

jury would have acquitted the defendant but for the error (*People v Crimmins*, 36 NY2d 230, 242, 238-242; *see, People v Murphy*, 128 AD2d 177, 184, *affd* 70 NY2d 969 *for reasons stated below*). In our assessment, given the quantum and nature of the evidence of defendant's guilt, the error did not contribute to defendant's conviction and there was no " 'significant probability' " that, without it, defendant would have been acquitted (*People v Murphy, supra,* at 184). Thus, admission of the irrelevant testimony was harmless (*cf., People v Stevens, supra; People v Winchell*, 98 AD2d 838, 840, *affd* 64 NY2d 826).

## The court did not err in denying removal of the case to Family Court.

Defendant contends that the District Attorney arbitrarily withheld his consent to removal of the case to Family Court; that defendant, at the least, is entitled to a hearing on the issue of arbitrariness; that the court in any event is empowered to grant removal over the District Attorney's objection; and that defendant is entitled to a hearing to decide factual questions relevant to the removal determination.

CPL 210.43 (1) (b) provides for removal of a murder charge against a juvenile offender from a superior court to Family Court upon the motion of any party or by the court *sua sponte,* based upon the following criteria: "[W]ith the consent of the district attorney * * * if the court finds one or more of the following factors: (i) mitigating circumstances that bear directly upon the manner in which the crime was committed; (ii) where the defendant was not the sole participant in the crime, the defendant's participation was relatively minor although not so minor as to constitute a defense to the prosecution; or (iii) possible deficiencies in the proof of the crime, and, after consideration of the factors set forth in subdivision two of this section, the court determine[s] that removal of the action to the family court would be in the interests of justice."

CPL 210.43 (2) provides:

"In making its determination pursuant to subdivision one of this section the court shall, to the extent applicable, examine individually and collectively, the following:

"(a) the seriousness and circumstances of the offense;

"(b) the extent of harm caused by the offense;

"(c) the evidence of guilt, whether admissible or inadmissible at trial;

"(d) the history, character and condition of the defendant;

"(e) the purpose and effect of imposing upon the defendant a sentence authorized for the offense;

"(f) the impact of a removal of the case to the family court on the safety or welfare of the community;

"(g) the impact of a removal of the case to the family court upon the confidence of the public in the criminal justice system;

"(h) where the court deems it appropriate, the attitude of the complainant or victim with respect to the motion; and

"(i) any other relevant fact indicating that a judgment of conviction in the criminal court would serve no useful purpose."

Despite the apparent intent of the Legislature to condition removal on the consent of the District Attorney (CPL 210.43 [1] [b]), the Court of Appeals has held that the District Attorney may not withhold his consent arbitrarily and that, in any event, the trial court retains statutory and inherent authority to remove an accused juvenile offender to Family Court in the interest of justice and over the objection of the prosecutor (*Matter of Vega v Bell*, 47 NY2d 543, 551-553; *see also, People v Hipp*, 197 AD2d 590, 591, *lv denied* 82 NY2d 896; *People v Murphy*, 128 AD2d 177, 186, *affd* 70 NY2d 969, *supra; People v Ryals*, 100 Misc 2d 551, *supra*). Nonetheless, the law provides that juvenile offenders who commit designated felonies should be treated as adults "unless there exist certain special circumstances warranting more lenient treatment and transfer to the Family Court" (*Matter of Vega v Bell, supra*, at 551). Removal generally is appropriate only in an "unusual" and "exceptional" case, and even then should be ordered over the prosecutor's objection only in "certain rare instances" in which "a prosecutor may be too closely involved in the prosecution to appreciate the benefits of juvenile treatment" (*Matter of Vega v Bell, supra*, at 553).

We conclude that the District Attorney did not arbitrarily withhold his consent to removal, and we see no need for a hearing to determine that issue. As expressed in the opposing papers, the District Attorney's objections to removal were well reasoned and were based on many of the same statutory criteria and related considerations ultimately relied upon by the court in its decision denying removal. Implying that there would be no deficiency in the proof on the element of culpable intent, and asserting that there were no mitigating circumstances warranting removal in the interest of justice *(see,* CPL

210.43 [1] [b] [i], [iii]), the People addressed the factors listed in CPL 210.43 (2). They urged that removal was inappropriate given the brutality and senselessness of the crime *(see,* CPL 210.43 [2] [a]); the extent of the harm caused by the offense to the victim's family, friends and neighbors, and to the community's sense of security *(see,* CPL 210.43 [2] [b]); the clear and overwhelming nature of the evidence of guilt *(see,* CPL 210.43 [2] [c]); and the benefits, to the criminal justice system and the community, of public resolution of the issue of guilt and public identification of defendant as a person who has shown a capacity to kill *(see,* CPL 210.43 [2] [e], [f], [g]). Additionally, the People pointed out that the victim's family opposed removal *(see,* CPL 210.43 [2] [h]). In denying removal, County Court relied on those factors and considerations, and additionally rejected the defense position that defendant's age and the possibility of a successful defense of mental disease or defect were, in and of themselves, mitigating circumstances warranting removal in the interest of justice. County Court did not abuse its discretion in reaching that determination *(see, People v Sanchez,* 128 AD2d 816, 817, *lv denied* 70 NY2d 655), and we see no need for a hearing on the statutory factors. Moreover, because County Court plainly exercised its discretion upon consideration of the appropriate statutory factors, we need not consider defendant's contention that County Court erroneously concluded, as a preliminary matter, that it lacked authority to remove the indictment to Family Court over the objection of the District Attorney.

## The sentence is not excessive.

■ Following his conviction for second degree murder as a juvenile offender, defendant was eligible to be sentenced to a minimum term of 5 years to life *(see,* Penal Law § 70.05 [2] [a]; [3] [a]). The court sentenced defendant to the maximum permissible term of 9 years to life *(see,* Penal Law § 70.05 [2] [a]; [3] [a]). Defendant contends that the sentence imposed is unduly harsh and severe and should be modified. Given defendant's brutal strangulation and bludgeoning of the four-year-old victim, and the calculating and cruel way in which those acts were carried out, we cannot say that the sentencing court did not appropriately balance the competing values of "societal protection, rehabilitation and deterrence" *(People v Farrar,* 52 NY2d 302, 305-306, citing *People v McConnell,* 49 NY2d 340,

346, and Penal Law § 1.05 [6]). We thus decline to exercise our discretion to modify defendant's sentence.

Accordingly, the judgment of conviction should be affirmed.

GREEN, FALLON, BALIO and BOEHM, JJ., concur.

Judgment unanimously affirmed.