**Eric M. SMITH, Petitioner,**

v.

**Patrick SULLIVAN, Director, Brookwood Secure Center, Respondent.**

No. 97–CV–6515L.

United States District Court, W.D. New York.

April 2, 1998.

Felix Lapine, Rochester, NY, for Petitioner.

Rene Davison, Attorney General, New York State Department of Law, Rochester, NY, for Respondent.

## DECISION AND ORDER

LARIMER, Chief Judge.

Petitioner, Eric M. Smith, while in custody at Brookwood Secure Center, filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. Smith was convicted at a jury trial in Steuben County Court on November 7, 1994 of one count of murder in the second degree. He was sentenced to a term of incarceration from nine years to life.

Petitioner appealed his conviction to the Appellate Division, Fourth Department, which affirmed his conviction on November 15, 1995. *People v. Smith*, 217 A.D.2d 221, 635 N.Y.S.2d 824 (4th Dep't 1995). The Court of Appeals denied leave to appeal on February 6, 1996. Petitioner also filed a motion to vacate his conviction under N.Y.Crim.Proc.L. § 440.10 in Steuben County Court. That court denied his motion on August 20, 1997, and the Appellate Division denied leave to appeal on November 12, 1997. In addition, petitioner sought a writ of error coram nobis from the Appellate Division, which denied that application on September 30, 1997.

The petition in this case was filed on November 17, 1997. Petitioner alleges that his conviction was obtained in violation of several of his constitutional rights, which will be discussed in detail below. Because I believe that no errors implicating the Constitution occurred at petitioner's trial, the petition for habeas corpus relief must be dismissed.

## BACKGROUND

The relevant facts in this case, which are for the most part not in dispute, are extensively set forth in the decision of the Appellate Division, familiarity with which is assumed. In short, the evidence in the record shows that on the morning of August 2, 1993, in Savona, New York, petitioner, who was then thirteen years old, encountered four-year-old Derrick Robie, who was walking by himself to a nearby park. Smith, who knew Robie, persuaded him to take a "shortcut" to the park through a wooded area. Once they had reached a secluded spot, Smith put his arm around Robie's throat from behind ·and began choking him. Robie eventually stopped resisting, whereupon Smith let him fall to the ground. Smith then threw a large rock on Robie's head several times. Smith left the scene shortly thereafter.

When Robie failed to return home from the park, his mother reported him missing, and police found his body that afternoon. The State Police immediately took charge of the investigation, and over the next several days, police interviewed some 500 witnesses. On the morning of August 5, Smith and his mother went to the police command post to offer information that Smith's mother thought might be helpful in the investigation. Smith stated that he had been in and out of the park three or four times on the morning of August 2, but he had not seen Robie.

At about 5:00 p.m. on August 5, investigators went to Smith's home and interviewed him, with his parents' permission, to clarify some minor discrepancies between Smith's statements and those of other witnesses. The interview took place at a picnic table in the Smith's yard. During that interview, which lasted forty-five to fifty minutes, Smith revealed for the first time that, while riding near the park on August 2, he had in fact seen Robie walking on the other side of the street, not far from the murder scene. Smith's account of seeing Robie, however, put Robie some fifty to seventy-five yards away from the area where other witnesses said they had seen him. Upon hearing that, the officer who was conducting the interview pressed the point further, asking Smith exactly where he had seen Robie. At one point during this discussion, Smith spontaneously burst out, "You think I killed him, don't you?" State Court Record ("R.") at 1525.[1]

---

1. The entire record of all the proceedings in the state courts has been combined and consecutively paginated for use in this case.

The officer replied that he did not think that at all, but merely wanted whatever information Smith had. Smith then said, "I'm not the type of person that would kill, hurt or sexually molest anyone." R. at 1526.

Again the officer assured Smith that he did not think Smith was involved in the murder, and the interview continued. Smith described Robie's clothing and lunch bag in some detail, which prompted the police to have Smith perform an impromptu eye test by trying to read nearby house numbers and automobile license plates. Smith was not able to see very well because he was not wearing his glasses, which had broken several weeks earlier. After the officers asked Smith a few more questions, Smith's great-grandfather, a retired sheriff's deputy, asked the officers to leave, which they did.

About an hour later, at 7:00 p.m., State Police investigators, accompanied by Steuben County District Attorney John Tunney, returned to Smith's home to ask if they could resume the interview. The officers assured Smith's great-grandfather that they were not accusing Smith, but merely trying to obtain accurate details from him, since he was the last known person to have seen Robie alive. Ultimately, the family agreed to allow Eric to accompany the police to the spot where Smith said he had seen Robie, so that Smith could reenact his movements and observations on August 2, the day of the murder.

During the reenactment, Smith pointed out where he had seen Robie, but he could make out only the outline of an investigator playing the role of Robie. Because it was getting dark, the parties agreed to return the next day to reenact the scene.

The next morning, Smith and his great-grandfather accompanied the police to the same spot, and the reenactment was video-taped. Again there were problems with Smith's account because Smith described others' movements inconsistently, and he was unable to see or describe an object carried by the officer portraying Robie. The officers questioned whether Smith really had seen Robie, and said that they needed to know before wasting time pursuing a false lead.

Police investigators subsequently interviewed Smith for two hours at their command post in the presence of Smith's great-grandfather. During the interview, Smith equivocated whether he had seen Robie. At the end of the interview, the police remained unsure whether Smith had seen Robie.

On August 8, Smith confessed to his mother, grandfather, and great-grandfather that he had killed Robie. Through an intermediary, Smith's great-grandfather arranged a meeting between himself and District Attorney Tunney at the Steuben County Office Building in Bath, New York. Smith's great-grandfather told Tunney that he wanted to handle the matter as "peaceful and as quiet as we can," and specifically asked to ·avoid the involvement of the State Police, the prospect of public arrest, and the possibility of a grand jury proceeding or other preliminaries. Tunney, however, persuaded Smith's great-grandfather that the State Police had to take Smith's statement. Tunney called for Bureau of Criminal Investigation Captain Walter DeLap to come to Tunney's office, and Smith's great-grandfather called his family to have Smith brought there.

Smith was taken to Tunney's office by his mother, stepfather, and grandfather shortly after 10:00 p.m. The family decided that only Smith's stepfather and great-grandfather would stay with Smith while he was being questioned by DeLap. Tunney left the room before the interview began because, as he had earlier explained to Smith's great-grandfather, he would have to prosecute the case and did not want to witness the statement. There is no evidence that the authorities ever promised that Smith would not be prosecuted criminally, though they did acknowledge to Smith's family that he needed psychiatric help and that he would be evaluated within a few days.

At the outset of the interview, DeLap sat directly across from Smith and explained the "ground rules" of the questioning, specifically that both Smith and DeLap must speak the truth. DeLap later testified that he gave Smith his Miranda warnings as follows:

[Y]ou have the right to remain silent.... [T]hat means you don't have to talk to me.... Furthermore, that is only the first

part of that. If you give up the right to remain silent, anything you say, good or bad, can be used in a court of law or used anywhere against you. If it goes against you, so be it.... That means you don't have to talk to me and if you do and it goes against you, so be it, but it will be the truth so it's not bad.... [A]lso you have the right to an attorney.

DeLap testified that he asked Smith whether he knew what an attorney was, and Smith said that he did not. DeLap told him, "[I]t's a lawyer. Do you know what a lawyer is? Okay." DeLap then continued:

You have a right to a lawyer. That means you have the right to a lawyer right now. We can stop right now and you can go buy a lawyer, have yourself a lawyer. If you can't afford one or your mom and dad can't afford one because they don't work or [are] out of work, whatever the case may be, one will be appointed to represent you before any questions.

R. at 464–66.

DeLap testified that several times while he was advising Smith of his rights, DeLap asked Smith if he understood what DeLap had just told him, and that Smith nodded, said, "Yes," or said, "I understand." R. at 467. DeLap also stated that he asked Smith's stepfather and great-grandfather if they understood and that they stated that they did. R. at 265–66.

Over the next three hours, Smith gave his account of the murder, the details of which were consistent with the physical evidence found at the scene. At no time did either Smith or his family ask to stop the interview or request a lawyer. Smith's confession was then typed as DeLap dictated from his interview notes. Smith suggested a minor change to the statement, initialed each page, and then signed the statement, as did each of the adults present. The statement also stated that Smith had been advised of his rights to remain silent, to an attorney, and to stop the interview at any time, and that he "freely and voluntarily g[a]ve up those rights ..." R. at 1675–77.

## DISCUSSION

### I. Admission of Petitioner's Statements to Police

Petitioner alleges that his Fifth Amendment right against self-incrimination was violated because his confession to DeLap was not made knowingly and intelligently. Petitioner contends that the warnings given to him by DeLap were inadequate, and that there was no unambiguous statement by Smith expressing a knowing and voluntary waiver of his rights.

As a threshold issue, I must determine the appropriate standard of review here, since both the trial court and the Appellate Division made a number of findings concerning Smith's confession. Both courts concluded that Smith waived his rights and confessed knowingly and voluntarily. Both courts also made certain findings about the circumstances under which Smith gave his confession.

State court findings of "historical" facts, and inferences drawn from those facts, are entitled to a presumption of correctness. *Matusiak v. Kelly*, 786 F.2d 536, 543 (2d Cir.), *cert. denied*, 479 U.S. 805, 107 S.Ct. 248, 93 L.Ed.2d 172 (1986). Section 2254(d) of Title 28 provides that a habeas corpus petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of that claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Section 2254(e)(1) also states that "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." The presumption of correctness attaches to findings both by state trial courts and by state appellate courts. *Nevius v. Sumner*, 852 F.2d 463, 469 (9th

Cir.1988), *cert. denied,* 490 U.S. 1059, 109 S.Ct. 1972, 104 L.Ed.2d 441 (1989).

Prior to the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214, which substantially amended the habeas corpus statutes, § 2254(d) provided that a state court "determination after a hearing on the merits of a factual issue ... shall be presumed to be correct," unless certain specified exceptions existed. AEDPA, then, changed the language dealing with the presumption of correctness of state court findings of fact and moved it to § 2254(e), and also added the current version of § 2254(d). The new version of § 2254(d) has clearly raised the bar for habeas petitioners, placing on them the burden to show by clear and convincing evidence that the state court decision was defective in some way. The amended statute "requires federal courts 'to give greater deference to the determinations made by state courts than they were required to do under the previous law.'" *Ford v. Ahitow,* 104 F.3d 926, 936 (7th Cir.1997) (quoting *Emerson v. Gramley,* 91 F.3d 898, 900 (7th Cir.1996) *cert. denied,* — U.S. —, 117 S.Ct. 1260, 137 L.Ed.2d 339 (1997)); *see also Houchin v. Zavaras,* 107 F.3d 1465, 1470 (10th Cir.1997) ("AEDPA increases the deference to be paid by the federal courts to the state court's factual findings and legal conclusion").

Prior to AEDPA, courts in habeas cases involving the voluntariness of a waiver and confession had held that state court findings that a defendant was given and understood his *Miranda* rights were presumed correct, but that the ultimate issue of the voluntariness of a waiver or confession was subject to *de novo* review. *See, e.g., Carter v. Johnson,* 131 F.3d 452, 461–62 (5th Cir. 1997); *Derrick v. Peterson,* 924 F.2d 813, 822 (9th Cir.1990), *cert. denied,* 502 U.S. 853, 112 S.Ct. 161, 116 L.Ed.2d 126 (1991).

Despite the language of the present version of § 2254(d), petitioner contends that this court should review *de novo* the issue of whether he voluntarily waived his rights and confessed to Robie's murder. On the contrary, I believe that *de novo* review is not the proper standard. Section 2254(d) precludes habeas relief on a claim that was adjudicated on the merits by a state court unless the adjudication itself was contrary to or unreasonably applied clearly established federal law, or was "based on an *unreasonable* determination of the facts ..." Under the new standard, then,

> federal habeas courts are no longer authorized to exercise *de novo* review over the ultimate issue of voluntariness, a mixed question of law and fact. Instead, [the court is] obliged to respect the judgment of the state court, provided it does not constitute an "unreasonable application" of clearly established federal law as determined by the Supreme Court.

*Carter v. Johnson,* 110 F.3d 1098, 1108 (5th Cir.), *vacated on other grounds,* — U.S. —, 118 S.Ct. 409, 139 L.Ed.2d 313(1997). "The 'unreasonable application' standard requires more than a mere disagreement with the decision of the state court, which would amount to the functional equivalent of *de novo* review." *Id.* 110 F.3d at 1103 n. 4. Relief may be granted under this standard "only when it can be said that reasonable jurists considering the question would be of one view that the state court ruling was incorrect. In other words, [the court] can grant habeas relief only if a state court decision is so clearly incorrect that it would not be debatable among reasonable jurists." *Drinkard v. Johnson,* 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 1114, 137 L.Ed.2d 315 (1997).

The admissibility of a confession has long been recognized as a mixed question of law and fact. *See Miller v. Fenton,* 474 U.S. 104, 112, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985); *Townsend v. Sain,* 372 U.S. 293, 309, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). As such, the state courts' adjudication of this issue is immune from collateral federal attack unless it constitutes an "unreasonable application" of clearly established federal law as determined by the Supreme Court. *Carter,* 110 F.3d at 1108 (characterizing this standard of review as "akin to the 'clearly erroneous' standard"); *see also Pitsonbarger v. Gramley,* 103 F.3d 1293, 1297 (7th Cir.1996) (federal habeas court's review of mixed questions of law and fact is "[i]n a sense" *de novo,* but

the question the court must answer is "whether the state court 'unreasonably' applied clearly established federal law as the Supreme Court has determined it"), *vacated on other grounds*, —— U.S. ——, 118 S.Ct. 37, 139 L.Ed.2d 6 (1997).

■ Applying this standard to the state courts' adjudication of the issue of the admissibility of Smith's statements, habeas relief is clearly not warranted. Without question, it is clearly established that an involuntarily-given confession is inadmissible in either a federal or state criminal trial. The state courts concluded on the facts presented that Smith's statement was admissible because it was voluntary. On the record before me, I cannot conclude that the state courts' rulings in that regard were based on an unreasonable determination of the facts. There was ample basis for reaching that conclusion. The evidence concerning the circumstances surrounding Smith's confession was certainly not so one-sided in Smith's favor that no reasonable jurist would find that the state courts' rulings were incorrect.

Even if I were to apply a *de novo* standard to the state courts' determination that Smith's confession was voluntary, however, my conclusion would be no different. Given the facts as reasonably determined by the state courts, I conclude that Smith's waiver of his rights and his confession were made voluntarily.

In Smith's state court proceedings, both the trial and appellate courts made detailed and significant findings concerning his confession. The trial court found that Smith "was advised appropriately of his rights pursuant to *Miranda* and Captain DeLap obtained a knowing and intelligent waiver by [Smith] of those rights in the presence of his great-grandfather and father." The court further found that Smith

and family members, including the great-grandfather, were aware that the Defendant had the right to remain silent, that anything he might say could be used against him in further legal process, that he did not have to give a statement, and that he had the right to have an attorney present before any statement was taken, and that if he could not afford a lawyer, a

lawyer would be appointed for him before any questioning. Therefore, "the Defendant understood the immediate meaning of the warnings . . ."

*People v. Smith*, No. 7197, slip op. at 3 (Steuben Co. Feb. 18, 1994).

The Appellate Division also made extensive findings in this regard:

The warnings given by DeLap clearly informed defendant that he had a right to a lawyer . . .

. . . DeLap unequivocally informed defendant that anything he said could "be used in a court of law or used anywhere against you." Contrary to defendant's assertion, the record does not contain a scintilla of evidence that defendant and his family were misled into believing that defendant would not be prosecuted as an adult. Defendant's great-grandfather, who acted as defendant's spokesman and chief protector throughout, necessarily understood the potential for, if not the certainty of, criminal prosecution. He asked the District Attorney if the matter could be handled without involving the State Police, and without Grand Jury or other preliminary proceedings. Moreover, the District Attorney told defendant's great-grandfather that he did not want to be present during defendant's interrogation because he would be prosecuting the case. Additionally, DeLap told defendant, in the presence of his family, "You have to answer for this."

. . . DeLap was scrupulously careful to explain the *Miranda* warnings, to ascertain defendant's understanding of those rights, and to elicit defendant's affirmative, knowing, intelligent, and voluntary waiver of each of those rights. It is important to note that the interrogation was initiated by defendant's family and that no effort was made to insulate defendant from his family . . . Defendant's step-father and great-grandfather were present throughout the interrogation and DeLap's testimony establishes that defendant and his family verbally indicated their understanding and agreement. . . . The record reveals that de-

fendant did [knowingly and voluntarily waive his *Miranda* rights].

*Smith,* 217 A.D.2d at 221, 635 N.Y.S.2d 824.

Many of these findings are factual in nature and therefore entitled to a presumption of correctness. Among those findings are the trial court's findings that Smith knowingly and intelligently waived his rights, and that he and his family understood his rights. Also entitled to a presumption of correctness are the Appellate Division's findings that DeLap clearly conveyed Smith's rights to him, that no one misled Smith or his family into believing that Smith would not be tried as an adult, that they were in fact aware that he could be tried as an adult, that Smith and his family verbally indicated that they understood Smith's rights, and that Smith affirmatively, knowingly and intelligently waived his rights. The Appellate Division extensively set forth the factual basis for those findings, and I conclude that the record supports those findings.

■ Based on the factual findings of the state courts, I agree with their determination that Smith's confession was voluntary. A voluntary waiver "occurs when the relinquishment is the 'product of a free and deliberate choice rather than intimidation, coercion, or deception.'" *Male Juvenile,* 121 F.3d at 41 (quoting *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)). The test for determining the voluntariness of a confession "is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *Derrick,* 924 F.2d at 817 (quoting *United States v. Leon Guerrero,* 847 F.2d 1363, 1366 (9th Cir.1988)). The Supreme Court has also stated that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

■ In support of this claim, petitioner recites a laundry list of alleged defects in the warnings that DeLap gave to Smith. He notes that DeLap told Smith that anything Smith said "can be used in a court of law or used anywhere against you," instead of saying that Smith's statements "can *and will* be used against you," which he claims made it sound less likely that Smith's statements would be used against him. He also claims that DeLap did not adequately inform Smith that he had a right to have a lawyer with him during the interview, and that Smith added misleading phrases such as "it will be the truth so it's not bad." Petitioner also contends that DeLap should have warned him of the possibility that he would be tried for murder as an adult.

I conclude that these allegations are insufficient to overcome by clear and convincing evidence the state courts' findings that Smith was informed of and fully understood his *Miranda* rights. DeLap's statements adequately conveyed Smith's rights to him and his family, and there is no evidence that he did not understand his rights or the consequences of waiving them.

First, the alleged omissions and misleading statements by DeLap, viewed in the context of everything he told Smith, did not render the warnings as a whole inadequate. The fact that DeLap's words may have varied in some ways from the precise language of *Miranda* is in itself of no moment. In *Duckworth v. Eagan,* 492 U.S. 195, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989), the Supreme Court observed that it "ha[s] never insisted that *Miranda* warnings be given in the exact form described in that decision." *Id.* 492 U.S. at 202 (footnote omitted). The Court explained that "*Miranda* warnings are 'not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected.'" *Id.* 492 U.S. at 203 (quoting *Michigan v. Tucker,* 417 U.S. 433, 444, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974)). "The inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda.*'" *Id.* (quoting *California v. Prysock,* 453 U.S. 355, 361, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981) (per curiam)).

■ Viewed as a whole, DeLap's warnings more than met that standard. He told

Smith, in language that a thirteen-year-old could understand, that Smith did not have to talk to DeLap, that anything Smith said could be used against him, and that Smith could have a lawyer present, regardless of whether his parents could afford to hire one. DeLap also made certain at every step of the way that Smith and his family understood all these rights, and they clearly indicated that they did. Smith unambiguously confirmed that he understood his rights, even explicitly saying, "I understand." The alleged defects in DeLap's warnings are inconsequential and fail to rise to the level of coercive police activity.

■ Petitioner's contention that DeLap should have advised him of the possibility that he would be tried as an adult is meritless. The only authority petitioner has submitted in support of that contention are two state court cases from South Dakota and New Hampshire, which are not binding on this court. Furthermore, the court has found no federal authority supporting petitioner's position. *See United States ex rel. Reed v. Acevedo,* No. 93 C 2915, 1993 WL 499708 *4 (N.D.Ill.Dec. 2, 1993) (denying habeas petition by petitioner who had testified in state court suppression hearing that he had not been told prior to confession that he would be prosecuted as an adult for murder). I also note that courts in a number of states have declined to adopt a *per se* rule requiring that a juvenile be warned of the possibility that he might be tried as an adult. *See, e.g., State v. Taylor,* 496 S.E.2d 811, 816 (N.C.App.1998); *State v. Campbell,* 691 A.2d 564, 567 (R.I.1997) ("neither *Miranda* nor any succeeding case of the Supreme Court has suggested that an interrogating officer must advise or admonish a suspect about possible methods of prosecution").

This result also comports with the totality-of-the-circumstances approach approved by the Supreme Court in *Fare v. Michael C.,* 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979), in which the Court reversed a decision by the Supreme Court of California that had held that a 16–year–old suspect's request to police that he be allowed to see his juvenile probation officer constituted a *per se* invocation of his right to speak to an attorney. The Court stated that a determination of whether statements obtained during an interrogation are admissible is to be based upon the totality of the circumstances surrounding the interrogation, adding, "We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so." *Id.* 442 U.S. at 725.

Examining the totality of the circumstances in the case at bar, I find no violation of petitioner's rights by DeLap's failure to expressly tell him that he might be prosecuted for murder as an adult. There is no evidence that DeLap or anyone else misled Smith or his family into thinking otherwise. As the Appellate Division noted, the District Attorney told Smith's great-grandfather that he did not want to be present during the interrogation because he might have to prosecute the case, and DeLap told petitioner, "You have to answer for this."

■ The Court in *Fare* did state that among the circumstances to be considered when the case involves a juvenile are the juvenile's "age, experience, education, background, and intelligence, and ... whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Id.* In the instant case, petitioner relies heavily on the fact that Smith was thirteen years old at the time of his confession, as well as school records indicating that intellectually he was functioning at a third–or fourth–grade level. The evidence presented at the Huntley hearing, however, focused solely on the events surrounding his confession, and there was no evidence indicating that Smith had any serious difficulties comprehending what was said to him. The school records (which were submitted in connection with Smith's application to remove the case to family court) may indicate below–average intelligence, but that in itself does not suggest that Smith would not have been able to understand what DeLap said to him. Furthermore, members of Smith's family were with him throughout. They were able to observe Smith and look for any signs of confusion on his part, or to seek clarification

of anything DeLap said that they thought was confusing or difficult to understand.

In addition, absent some evidence of coercion, evidence of a person's mental state, without more, cannot support a finding of involuntariness. *See Singleton v. Thigpen,* 847 F.2d 668, 671 (11th Cir.1988) (rejecting petitioner's claim that his confession should not have been admitted because evidence of his low IQ was not before the trial court when it determined that his confession was voluntary, since there was no evidence of coercive police tactics, which is a necessary predicate to a finding of involuntariness), *cert. denied,* 488 U.S. 1019, 109 S.Ct. 822, 102 L.Ed.2d 812 (1989); *see also Connelly,* 479 U.S. at 161, 167 (without evidence of police coercion, evidence that, at the time of his confession, petitioner was suffering from chronic schizophrenia, was in a psychotic state, and confessed because he was following commands from the "voice of God" did not render confession involuntary within meaning of Due Process Clause).

Furthermore, the law is clear that a person's age or mental impairment, while relevant to an analysis of whether police behavior was coercive, will not suffice to show involuntariness if the record as a whole indicates that the person understood his rights and freely chose to waive them. The Supreme Court has stated that "while mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." *Colorado v. Connelly,* 479 U.S. 157, 165, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

A review of cases dealing with this issue is instructive. In *Male Juvenile,* 121 F.3d 34, the defendant, who was sixteen at the time, was seen by a Military Police ("MP") investigator near the scene of a restaurant that had just been robbed on a military base. The investigator, who knew the defendant and had been on good terms with him, jokingly said to him, "That's it, get to the station," and the defendant, not realizing that the investigator was joking, went to the MP station. When the investigator found him at the station later, he asked the defendant to see if he could find out anything about the robbery.

Five days later, the investigator saw the defendant and asked him to meet him at the station later to disclose any information he had obtained. When the defendant arrived, the investigator and a colleague told the defendant that he was not in trouble, and began interviewing him. During a break in the interview, the defendant telephoned his mother, who came to the station. The investigators assured her that her son was not in trouble, and at their request she agreed to wait in the hallway during the interview. The interview resumed, with the added presence of an FBI agent who had arrived. At one point the defendant began to cry, and the FBI agent, suspecting that the defendant had been involved in the robbery, showed defendant his badge and advised him of his *Miranda* rights. The defendant stated that he understood his rights, and declined an offer to let him speak to his mother. The FBI agent later testified that he told the defendant that "no matter what he said to me, that he was going to be allowed to leave that evening," and he admitted that he made this promise in part "to get [defendant] to open up and speak to [him]." *Id.* 121 F.3d at 36. The defendant agreed to continue, and confessed that he had acted as a "lookout" during the robbery. He was convicted of theft of property by force and violence within the territorial jurisdiction of the United States in violation of 18 U.S.C. § 2111.

Affirming the conviction, the Second Circuit rejected the defendant's contention that his waiver of his *Miranda* rights and his confession were rendered involuntary by a combination of his learning and comprehension disabilities, the coercive nature of the interrogation, and the agent's and investigators' promises of leniency. In support of this argument, the defendant cited evidence that he had been in special education since the first grade and that his reading comprehension was at a second-grade level. The court stated that although the evidence showed "that defendant has a host of attentional and learning disabilities, nothing in the testimony or psychological reports indicates that defendant could not comprehend the rights that were explained and read to him." *Id.* 121 F.3d at 40. The court also stated that the

FBI agent's statement to the defendant that he could go home that night did not change the court's conclusion, because the agent's other statements when advising the defendant of his rights made clear to the defendant that adverse consequences could attach to a confession. *Id.* at 42.

Courts of appeals from other circuits have reached similar conclusions. In *Starr v. Lockhart,* 23 F.3d 1280 (8th Cir.), *cert. denied,* 513 U.S. 995, 115 S.Ct. 499, 130 L.Ed.2d 409 (1994), the petitioner had confessed after being advised of his *Miranda* warnings. Arguing that his confession was involuntary, the petitioner pointed to evidence that he had spent time in institutions for the mentally retarded, and scored from 38 to 62 on IQ tests. Even his highest scores placed him within the lowest one percent of the adult population in intelligence. *Id.* 23 F.3d at 1287. The Eighth Circuit rejected this claim, however, since the record showed no police coercion. The court likewise rejected the petitioner's claim that his waiver could not have been knowing and voluntary because he could not have understood his rights. The court stated that the petitioner's answers to police officers' questions were lucid and reflected complete understanding of what was said to him. *Id.* at 1294.

In *United States v. Macklin,* 900 F.2d 948 (6th Cir.), *cert. denied,* 498 U.S. 840, 111 S.Ct. 116, 112 L.Ed.2d 86 (1990), the two defendants had confessed to forgery without having been advised of their *Miranda* rights. One had an IQ of about 60, and there was expert testimony that his reading, spelling, and arithmetic abilities were in the bottom 0.5% of the population. A psychologist testified that the defendant had "very severely limited capacity to understand verbal instructions." *Id.* 900 F.2d at 950. The other defendant's IQ was 70, and she was considered borderline mentally retarded. The Sixth Circuit reversed the district court's order suppressing their confessions, holding that the defendants were not in custody (thus rendering *Miranda* warnings unnecessary), and that the defendants' mental conditions did not render their confessions involuntary, since there was no evidence of either coercion or overreaching by the agents, or that the defendants did not understand the consequences of their actions.

In *Russell v. Jones,* 886 F.2d 149 (8th Cir.1989), a habeas case, the petitioner, who was eighteen at the time that he signed a waiver of his rights and confessed, claimed that he was not competent to do so. In support of this assertion, the petitioner pointed to his low reading ability, which was evaluated as being at a first–or second–grade level, and claimed that the police told him that he "had to" sign the waiver and confession, that he could go home once he had done so, and that the judge would "go easy on him" if he cooperated. *Id.* at 151. The Court of Appeals affirmed a denial of the petition, stating that there was no evidence to suggest that the petitioner could not comprehend why he was being questioned, and that there were no state court findings of police misbehavior.

In *Moore v. Dugger,* 856 F.2d 129 (11th Cir.1988), the petitioner, who had been convicted of murder, contended that his confession was involuntary and should not have been admitted. He stressed evidence that he had an IQ of 62, functioned at the intellectual level of an eleven-year-old, and was classifiable as "educable mentally handicapped." *Id.* at 132. Affirming a dismissal of the petition, the Eleventh Circuit noted that "mental deficiencies of a defendant, by themselves, are not sufficient to render a confession involuntary," and that "[t]o establish that his confession was involuntary, petitioner must also establish police coercion." *Id.* at 132. Rejecting the petitioner's claim that a police detective's statement that the petitioner could not go home "right this minute" because they "need[ed] to talk some more" amounted to a promise that the petitioner could go home if he confessed, the court said that the trial court's finding that the police did not make him any promises was a factual finding entitled to a presumption of correctness. *Id.* Since there was no other evidence of police coercion, the court held, the confession was properly admitted. The court concluded that "despite petitioner's mental limitations, there is ample support for the conclusion that his waiver of his

*Miranda* rights was intelligent as well as voluntary." *Id.* 856 F.2d at 135.

In *Winfrey v. Wyrick,* 836 F.2d 406 (8th Cir.1987), *cert. denied,* 488 U.S. 833, 109 S.Ct. 91, 102 L.Ed.2d 67 (1988), a psychiatrist had testified at trial that the petitioner was in the "dull normal" range of intelligence, that though he was eighteen at the time of his psychiatric evaluation (which was performed about a year after his confession) his mental age was fourteen or fifteen, and that he was at a fifth– or sixth–grade level of academic achievement. The psychiatrist opined that it was doubtful that the petitioner would have understood the full consequences of waiving his rights. *Id.* 836 F.2d at 408. The state court found that the petitioner had been advised of and understood his rights, but the district court granted the habeas petition on the ground that the confession was involuntary. The Court of Appeals for the Eighth Circuit reversed, stating that the district court had not given the state court's factual findings enough deference. The court further held that the petitioner's age and low IQ did not render his confession involuntary absent any evidence of police coercion. *Id.* at 410–11.

■ Although every case must be decided on its own facts, these cases make clear that where the evidence indicates that the petitioner understood his rights and the consequences of waiving them, his youth or diminished mental capacity will not in themselves establish involuntariness. The record here gives no indication that Smith did not understand what DeLap was telling him, and he certainly understood that he was talking to a police officer about a murder that he had committed. Notably, the one time he did not understand something DeLap had said—the reference to an "attorney"—Smith said so, and DeLap explained that he meant a lawyer, which Smith understood. Smith also unequivocally stated that he understood his rights, and his signed statement (the contents of which he clearly knew, since he suggested one factual change before signing it) stated that Smith "freely and voluntarily g[a]ve up his rights." In short, the record simply does not support petitioner's claim that Smith's waiver of his rights and his confession were anything other than knowing, intelligent, and voluntary. There is no basis to disturb the state courts' findings on this issue.

## II. Ineffective Assistance of Counsel

### A. Failure to Research Applicable Law

■ Petitioner claims that he received ineffective assistance of counsel in violation of his rights under the Sixth Amendment. First, he claims that his trial attorney, Kevin P. Bradley, Esq., did not adequately investigate New York law with respect to the defense of mental disease or defect, which Bradley relied upon at trial. New York Penal Law § 40.15 makes it an affirmative defense "that when the defendant engaged in the proscribed conduct, he lacked criminal responsibility by reason of mental disease or defect," which requires proof that "he lacked substantial capacity to know or appreciate either: ... [t]he nature and consequences of such conduct; or ... [t]hat such conduct was wrong."

Smith contends, and Bradley has stated in an affidavit, that throughout the trial, Bradley was unaware of the New York Court of Appeals' decision in *People v. Adams,* 26 N.Y.2d 129, 135, 309 N.Y.S.2d 145, 257 N.E.2d 610 (1970), in which the court approved a jury instruction that, where the defendant had raised the defense of mental disease or defect, the prosecution had to prove "that at the time of the killing the defendant knew she was hurting the decedent and that she knew this act was wrong." Bradley claims that because of his ignorance of *Adams,* he virtually conceded at trial that Smith had known that he was hurting Robie, arguing only that Smith was unaware that he was killing Robie. Bradley states that he was therefore completely shocked when the trial court instructed the jury to determine whether Smith was "able to understand these acts would result in harm or cause death to another person." R. at 2514 (emphasis added).

Bradley also states that he was unaware of *Adams* during his representation of Smith on direct appeal. As a result, his brief on appeal argued that the trial court had erred in

instructing the jury that Smith's knowledge that he was harming Robie would be sufficient for a murder conviction. *See* Petitioner's Appellate Brief at 61–64. Bradley apparently first became aware of *Adams* at oral argument when Presiding Justice Denman asked him if he had ever heard of *Adams*.

This claim of ineffective assistance must be analyzed according to the standards set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Court stated that the test for an ineffective-assistance claim in a habeas corpus case is whether the petitioner received "reasonably competent assistance." *Id.* 466 U.S. at 688. In deciding this question, the court must apply an objective standard of reasonableness. *Id.*

Generally, defense counsel are "strongly presumed to have rendered adequate assistance ..." *Id.* at 690. To succeed on such a claim, then, the petitioner must "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

If defense counsel's performance is found to have been defective, relief may only be granted where it is shown that the defense was actually prejudiced by counsel's errors. *Strickland*, 466 U.S. at 692. Prejudice is established upon a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The court determines the presence or absence of prejudice by considering the totality of the trial evidence. *Id.* at 695.

After reviewing the record, I find that Smith's claim regarding Bradley's unawareness of *Adams* fails. First, to put this claim in the context of Bradley's overall performance, it is worth noting that a timesheet submitted by Bradley to the trial court in support of a motion for interim payment for his time and expenses indicates that as of August 16, 1994, Bradley had spent 514.9 hours on the case. That included: making

and arguing motions to suppress evidence and to remove the action to family court; interviewing numerous witnesses, many more than once; retaining the services of and consulting with three expert witnesses; obtaining various medical, school and other records; and doing research both in the law and in psychiatry. *See* Respondent's Memorandum of Law Ex. A. He also spent a full three weeks actually trying the case. This is clearly not a case in which counsel's performance was inadequate for sheer lack of effort.

Assuming *arguendo* that Bradley's alleged failure to discover or read *Adams*[2] could be considered objectively unreasonable, that does not end the matter. Petitioner must also demonstrate a reasonable probability that, had Bradley read *Adams* prior to the trial, the result of the trial would have been different. *Id.* 466 U.S. at 694. That issue must be considered in light of the totality of the evidence before the jury. *Id.* at 695.

The difficulty with petitioner's claim is that the evidence presented at trial clearly showed that Smith realized at the time of the murder that he was harming Robie. In his written confession, Smith stated that when he first approached Robie, Smith "knew [he] wanted to take him some place and hurt him." R. at 1679. The defendant's own expert psychiatrist, Stephen T. Herman, M.D., also testified that some people, including Smith, experience instances of "episodic rage," but that such people "are not psychotic, they are not paranoid by our definition, they are not having a hallucination, what's called a command hallucination saying hurt that person and they are hearing it." R. at 1961. He also testified that Smith told him: "that he just became angry when he saw Derrick and he said to himself that he wanted to hurt him ...."; "that when he saw Derrick, he knew and felt that he wanted to hurt Derrick ...."; and "I had to get my anger out on him. I wanted to hurt him." R. at 1995, 2018, 2070. Herman also described Smith as having "a sadistic side," which he defined as "being intentionally cruel." R. at 2084, 2165. When asked on cross-

---

2. This also assumes that Bradley was in fact unaware of *Adams*. The only evidence of that is Bradley's own after-the-fact statements; whether he had failed to read *Adams* is ultimately unprovable.

examination whether, to be sadistic, "you have to consciously be aware of what you are doing and accomplish it," he responded, "That's probably so, yes. I would agree with that." R. at 2166.

Herman never stated that he thought that Smith had been unaware that he was harming Robie. All he stated was that "at the time of the attack I did not have a sense that Eric was aware of his state of mind enough to realize that he was *killing* a child ..." R. at 2084 (emphasis added). Similarly, he opined that Smith "was not able to have insight into what he was doing at that moment in terms of what the *end result* would be ... He didn't make a choice in terms of whether or not to commit *homicide*." R. at 2117 (emphasis added). Thus, his testimony was consistent with Bradley's position that Smith had not realized that he was killing Robie, but that he did realize that he was harming him.

Faced with this evidence, then, there was simply no basis upon which to argue to the jury that the essential elements of the defense of mental disease or defect were all present here. The evidence clearly showed that Smith had known that his actions would result in harm to Robie, which made it virtually impossible for this defense to succeed.

It is true that Bradley asked the jury to return a verdict of not responsible by reason of a mental disease or defect, but that is of no consequence. Whether he asked for that verdict or not, the evidence did not support that verdict, so it can hardly be said that: "there is a reasonable probability" that, had Bradley done anything differently in this regard, the outcome would have been different. If Bradley had been aware of *Adams*, he could have pursued the mental–disease–or–defect defense anyway, attempting to argue that Smith did not intend to harm Robie. Since the evidence did not support that defense, though, that approach would almost certainly have failed. Bradley's other option would have been to abandon that defense, and ask for a first– or second–degree manslaughter verdict. Since the jury was given those options, though, and since Bradley did discuss them in his closing argument, *see* R. at 2443–46, Smith was not prejudiced by his

also asking for a verdict of not responsible by reason of a mental disease or defect. This is not a case in which counsel had the proof to support a certain affirmative defense, but somehow botched his presentation of that defense; the proof was simply lacking. A criminal defendant in that situation can suffer no prejudice by having his attorney ask the jury to return a more lenient verdict than the evidence will support. Such a request may not do the defendant any good, but it cannot do him any harm, either.

In addition, Bradley did not take an all–or–nothing approach to Smith's case. He did not abandon pursuing lesser charges. He did not ask that the jury be given only the options of guilty, not responsible by reason of mental disease or defect, or not guilty. He also requested and received jury charges on the lesser included offenses of first–and second–degree manslaughter, as well as the defense (to the murder charge only) of extreme emotional disturbance, which, if successful, would have reduced the conviction from murder to first–degree manslaughter.

In New York, first-degree manslaughter requires an intent to cause serious physical injury, and second-degree manslaughter occurs when a person recklessly kills another. In fact, at the charge conference, Bradley stated that "[m]anslaughter, second, appears to fit the evidence perhaps better than anything else," and that although Dr. Herman had testified that Smith had the intent to injure Robie, the jury might be able to find that Smith had only "a generalized intent to hurt and not a specific intent to cause serious physical injury ..." as required for first-degree manslaughter. R. at 2377–78. In addition, when Dr. Herman was asked on cross-examination whether Bradley had told him previously "that he was looking for a verdict of manslaughter," Dr. Herman responded, "Yes, he did, in essence." R. at 2373, 2134.

Given the overwhelming evidence that Smith did intend to harm Robie, it was certainly reasonable for Bradley to seek a lesser charge of manslaughter. In fact, in one sense a manslaughter conviction would have been preferable to a not responsible verdict, since the former could have resulted in a

minimum sentence of eighteen months imprisonment, *see* N.Y.Penal L. § 70.02,[3] whereas a verdict of not responsible by reason of mental disease or defect could have resulted in Smith's being confined to a mental institution, perhaps for the rest of his life. *See* N.Y.Crim.Proc.L. § 330.20.

In short, then, even if Bradley's failure to discover the *Adams* decision were objectively unreasonable, petitioner cannot succeed on his Sixth Amendment claim on this basis because he cannot show any prejudice as a result. Had Bradley been aware of *Adams*, at most he simply would have not made any attempt to present the defense of mental disease or defect, and the ultimate result would likely have been the same. *See Langford v. Day*, 110 F.3d 1380, 1387–88 (9th Cir.1996) (petitioner's attorney's failure to advise him that he might have been able to obtain an independent psychiatrist to aid in his defense in murder prosecution did not constitute ineffective assistance, since petitioner had not shown that his sanity was likely to be an issue, and there was no reason to believe that psychiatric evaluation beyond that which had already occurred would have created an issue regarding petitioner's mental competence), *cert. denied*, — U.S. —, 118 S.Ct. 208, 139 L.Ed.2d 144 (1997); *Black v. Collins*, 962 F.2d 394, 403–04 (5th Cir.) (petitioner's attorneys' alleged failure to investigate petitioner's mental disorders, or to present evidence of those disorders to jury during penalty phase of murder trial, was not unreasonable, since any information about petitioner's disorders beyond what attorneys already knew would not have changed their decision not to present such evidence for fear that such evidence would be seen by the jury as indicating that petitioner was likely to commit similar crimes in the future), *cert. denied*, 504 U.S. 992, 112 S.Ct. 2983, 119 L.Ed.2d 601 (1992); *Keys v. Duckworth*, 761 F.2d 390, 392–94 (7th Cir.1985) (rejecting ineffective-assistance claim based on petitioner's attorney's alleged failure to investigate

intoxication defense in attempted-rape prosecution, because the facts in the record strongly refuted any intoxication defense, and thus there was no reasonable probability that counsel's failure to investigate that defense affected the outcome of the trial); *Burris v. Parke*, 948 F.Supp. 1310, 1332–35 (N.D.Ind.1996) (assuming *arguendo* that petitioner's attorney's failure to investigate and introduce at penalty phase of murder trial evidence that petitioner had been sexually abused as a child could be deemed constitutionally deficient, petitioner could not show prejudice, since counsel did introduce substantial other evidence of defendant's deprived and violent childhood environment, and there was no reason to believe that evidence of sexual abuse would have affected sentence), *aff'd*, 116 F.3d 256 (7th Cir.), *cert. denied*, — U.S. —, 118 S.Ct. 462, 139 L.Ed.2d 395 (1997).

### B. Failure to Challenge Voluntariness of Petitioner's Confession

Petitioner also alleges that his trial attorney was ineffective because, although he did move (unsuccessfully) to suppress Smith's statements to the police on the ground that the *Miranda* warnings that were given to Smith were inadequate, he did not look into whether, or argue that, Smith did not understand the warnings.

As previously explained, however, I find that Smith's confession was completely voluntary. It follows that the state courts would likely have rejected the claim that Smith did not understand the warnings, and hence Bradley's failure to raise this issue did not constitute ineffective assistance.

### III. Decision to Try Petitioner as an Adult

Petitioner's remaining claim is that his due process rights were violated by the prosecutor's and the trial court's decision to try him as an adult. Some factual background is necessary to understand this claim.

---

**3.** Section 70.02 has been amended to provide that the minimum period of imprisonment under an indeterminate sentence for a violent felony offense must be fixed by the court at one-half of the maximum term imposed. At the time of Smith's conviction, the minimum term was required to be fixed at one-third of the maximum term imposed, and then as now, the lowest possible maximum term for second-degree manslaughter, a class C felony, was 54 months. N.Y.Penal L. § 70.02(3)(b).

In May 1994, petitioner moved pursuant to N.Y.Crim.Proc.L. § 210.43 for removal of the proceeding from criminal court to family court. Although Penal Law § 30.00(2) allows thirteen-year-olds to be tried for murder as adults, § 210.43 allows removal of a case to family court for juvenile prosecution where: the district attorney consents; there are "mitigating circumstances that bear directly upon the manner in which the crime was committed"; and there are "relevant fact[s] indicating that a judgment of conviction in the criminal court would serve no useful purpose."

In support of the motion for removal in Smith's case, the defense alleged that the case was an exceptional one because psychological evidence revealed that Smith's act was the result of a lifelong mental disease, specifically a "pathological rage disorder." The District Attorney opposed the motion, submitting a seven-page affidavit addressing the factors listed in § 210.43(2). On June 7, 1994, the trial court denied petitioner's application for removal to family court. Although the court expressed doubt whether it had the power to remove without the District Attorney's consent, the court nevertheless considered the merits of the application in light of the factors set forth in § 210.43(2). The court concluded that, because of the seriousness of the offense, the strong evidence of guilt, the need for such act to be punished under the New York Penal Law, and the need for public scrutiny of the proceeding, Smith's was not one of the rare cases in which removal was warranted.

Petitioner now contends that the District Attorney's refusal to consent was arbitrary. He further contends that Smith's emotional disturbance constituted a mitigating circumstance, and that given Smith's need for therapy, a criminal conviction served no useful purpose. He alleges that due process at least required the trial court to hold a hearing on the application.

In support of this claim, petitioner relies upon *Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966). In *Kent*, a juvenile defendant was arrested and brought before a juvenile court in the District of Columbia. Without holding a hearing or conducting any investigation, the juvenile court issued an order waiving jurisdiction and ordering the defendant to be held for trial in the United States District Court, where he was ultimately convicted.

The Supreme Court reversed the conviction. Stating that "the waiver of jurisdiction is a 'critically important' action determining vitally important statutory rights of the juvenile," *id.* 383 U.S. at 556, the Court stated that it was "incumbent upon the Juvenile Court to accompany its waiver order with a statement of the reasons motivating the waiver," and that "an opportunity for a hearing ... must be given the child prior to the entry of a waiver order." *Id.* at 561.

I do not believe that *Kent* supports petitioner's position in the case at bar. First, there is no indication from the record that petitioner requested a hearing. The motion itself says nothing about a hearing, and petitioner does not contend that his trial attorney ever made such a request.

Second, the Court in *Kent* did not specify the precise nature of the hearing required. The Court stated that the hearing "may be informal ...," *id.*, and added that it did "not mean ... to indicate that the hearing to be held must conform with all of the requirements of a criminal trial or even of the usual administrative hearing; but we do hold that the hearing must measure up to the essentials of due process and fair treatment." *Id.* at 562. *See also Stokes v. Fair*, 581 F.2d 287, 289 (1st Cir.1978) (*Kent* did not "promulgate[ ] a standard list of absolute procedural guarantees which must be provided before an accused juvenile can receive adult offender treatment"), *cert. denied*, 439 U.S. 1078, 99 S.Ct. 858, 59 L.Ed.2d 47 (1979).

In Smith's case, his motion was accompanied by a twenty-three-page affirmation by his attorney setting forth the basis for the motion, and eighty-two pages of supporting exhibits, including police interview reports, medical and psychological evaluations, school reports, and a transcript of testimony given by his great-grandfather from Smith's Huntley hearing. The trial court, which accurately described the materials submitted on the application as "voluminous," also stated in its

decision denying the application that it had examined the grand jury minutes.

Petitioner has not identified what additional evidence would have been presented at a "hearing" or how a formal hearing would have affected the trial court's decision. Petitioner's assertion that the trial court "did not consider the factual showing offered" by the defense, *see* Petitioner's Memorandum of Law at 22, is simply not supported by the record. The procedure followed here allowed petitioner to submit extensive relevant evidence, and was sufficient to comport with the requirements of due process.

Smith's case is also distinguishable from the situation presented in *Kent* in another way. In *Kent,* the juvenile court was vested by statute with "original and exclusive jurisdiction" over the defendant. 383 U.S. at 556. The statute also gave the juvenile court authority to waive jurisdiction "after full investigation ...," although it set forth no standards upon which the juvenile court judge was to make the determination whether to waive jurisdiction. *Id.* at 547.

In contrast, in Smith's case, Criminal Procedure Law § 10.20(1)(a) gave *superior* courts (which includes county courts, *see* Crim.Proc.L. § 10.10(2)), exclusive trial jurisdiction over all felonies. Section 210.43 simply allows a superior court to order removal to family court, if, after considering the factors set forth in that section, the superior court determines that removal would be in the interests of justice.

The significance of this distinction was explained by the Court of Appeals for the Fifth Circuit in *Lane v. Jones,* 626 F.2d 1296 (5th Cir.1980), *cert. denied,* 450 U.S. 928, 101 S.Ct. 1384, 67 L.Ed.2d 359 (1981). There, a fifteen-year-old had been arrested and charged with murder. A Georgia statute provided that the juvenile and superior courts had concurrent jurisdiction over such cases. The statute was silent as to how a selection would be made between the two courts, but decisions of the Georgia Supreme Court had established that whichever court first took jurisdiction retained it.

When the petitioner in *Lane* was taken into custody, his attorney, seeking to hasten the jurisdiction of the juvenile court, took the unusual step of presenting a petition to the juvenile court alleging his own client's delinquency. The juvenile court judge refused to accept the petition, and ultimately the petitioner was tried and convicted in the superior court.

In his federal habeas petition, the petitioner, relying on *Kent,* alleged that the juvenile court's refusal without a hearing to accept the delinquency petition, and thus jurisdiction as well, deprived him of due process of law. Rejecting this claim, the Fifth Circuit stated that whereas in *Kent* the juvenile court, which was vested with original and exclusive jurisdiction, waived that jurisdiction without undertaking any investigation as required by the statute, in *Lane* the statute imposed no affirmative requirements on the juvenile court, but simply gave two courts concurrent jurisdiction. The juvenile court failed to assert jurisdiction, which was asserted by the superior court.

The Fifth Circuit held that the situation presented in *Lane* was therefore controlled not by *Kent,* but by its prior decision in *Woodard v. Wainwright,* 556 F.2d 781 (5th Cir.1977), *cert. denied,* 434 U.S. 1088, 98 S.Ct. 1285, 55 L.Ed.2d 794 (1978), in which the court found no constitutional infirmity in a Florida statute permitting state prosecutors to employ their discretion to seek indictments against juveniles charged with serious crimes notwithstanding the fact that the filing of such an indictment ousted the juvenile court of its otherwise exclusive jurisdiction. The court in *Lane* stated that Lane's case was even weaker than the one in *Woodard,* since in *Lane* "no juvenile court jurisdiction ever attached.... If removing a case from a juvenile court, which otherwise has exclusive jurisdiction, can be accomplished without a hearing, clearly bringing a case in a court which has concurrent jurisdiction to begin with does not violate due process." *Lane,* 626 F.2d at 1299.

In the case at bar, petitioner's claim is even weaker than that in *Lane.* By statute, the superior court did not have concurrent jurisdiction with the family court, it had "[e]xclusive trial jurisdiction ..." N.Y.Crim. Proc.L. § 10.20(1)(a). The family court did

not waive jurisdiction; it had none to begin with. Instead, the county court, after considering the factors set forth in § 210.43(2), decided that removal to family court would not be in the interests of justice, and it therefore retained its jurisdiction. The due process concerns that were implicated in *Kent,* then, were not present here. *See Stokes,* 581 F.2d at 289 ("the federal government treats the question of whether a defendant is to be charged as an adult criminal or a juvenile delinquent as one of prosecutorial discretion devoid of most due process guarantees").

### CONCLUSION

Petitioner's petition for a writ of habeas corpus is dismissed.

Because the issues raised in the petition are not the type that a court could resolve in a different manner, and because these issues are not debatable among jurists of reason, this court concludes that the petition presents no federal question of substance worthy of attention from the Court of Appeals and, therefore, pursuant to 28 U .S.C. § 2253 and Fed.R.App.P. 22(b), this court denies a certificate of probable cause. Finally, because it appears that any appeal would not be taken in good faith, leave to appeal *in forma pauperis* will be denied.

IT IS SO ORDERED.