Deon LAWRENCE, Petitioner,

v.

Christopher ARTUZ, Superintendent Green Haven Correctional Facility, Respondent.

No. CV981610.

United States District Court, E.D. New York.

April 4, 2000.

Deon Lawrence, Stormville, NY, petitioner pro se.

Denis Dillon, Nassau County District Attorney, by Tammy J. Smiley, Noreen Healey, Assistant Nassau County District Attorneys, Mineola, NY, for respondent.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

Deon Lawrence petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his 1993 state court convictions on murder and robbery charges. For the reasons discussed below, the petition is denied.

## BACKGROUND

I. *Factual Background and The Arrest and Indictment of Deon Lawrence*

A. *The Shooting of Peter Reitberger*

On the night of November 14, 1991, Peter Reitberger and Marco Nunez went to Abermerle Avenue in Hempstead, New York, to purchase crack cocaine. They were robbed at gunpoint, by Petitioner, Deon Lawrence ("Lawrence" or "Petitioner") and his cohort, Geddis Harris. During the course of the robbery, Lawrence used a sawed-off double barreled shotgun which he brought to the robbery to shoot

and kill Peter Reitberger. Marco Nunez escaped from the scene and Petitioner and Harris fled before the arrival of the police.

B. *The Eyewitness Account of the Events and the Arrest of Lawrence*

Shortly after the shooting, Nunez met with the Nassau County detective assigned to the case, Detective Martin Alger. Nunez related the following events to Detective Alger. On the night of November 21, 1991, at approximately 11:00 P.M., Nunez and Reitberger left their apartment on Villa Court in Hempstead to go to Abermerle Avenue to purchase crack cocaine. Reitberger took $10 with him for the purchase.

When they arrived at Abermerle Avenue, Nunez and Reitberger were approached by two black men, one of whom was carrying a black gym bag and the other of whom asked the pair for a cigarette. Reitberger said they had no cigarettes but that they wanted to buy crack. The man with the gym bag (later identified as Lawrence) directed Nunez and Reitberger to an alleyway behind an apartment complex on Abermerle Avenue. Once they were in the back alley, the man with the gym bag removed a sawed-off shotgun from the bag, pointed it at Reitberger's face, and announced the robbery. Nunez and Reitberger were ordered to stand against the fence and one of the men took the $10 Reitberger had in his pocket.

During the course of the robbery, Nunez and Reitberger were ordered by the robbers to take off their pants. When they refused, a scuffle ensued between Reitberger and the gunman. Nunez saw the gunman hit Reitberger with the gun and saw Reitberger face the gunman. As Nunez ran from scene, he heard the gunfire that killed Reitberger.

After the interview with Nunez, Detective Alger determined that Lawrence was a suspect in the Reitberger shooting. Alger had Nunez review police photographs on several different occasions. Nunez was

repeatedly unable to identify the shooter. Finally, Alger prepared a photographic array, which included a photograph of Lawrence, to be presented to Nunez. This array was prepared by having a police department computer cull photographs matching the physical description of the shooter provided by Nunez. The computer's chosen photographs were put in a packet along with a photograph of Lawrence and shown to Nunez. Nunez immediately and unequivocally identified Lawrence as the shooter.

Upon Nunez's identification of Lawrence, Alger undertook to have Lawrence arrested by Nassau County police officers. The police arrested Lawrence on December 6, 1991, and he was brought in for questioning by Detective Alger.

### C. The Interrogation of Lawrence and His Confession

When he was arrested, Lawrence was in possession of a gun. He told Alger that he thought he was arrested for that possession. Alger then advised Lawrence of his *Miranda* rights by reading the rights from a *"Miranda* card." He showed the card to Lawrence who then read his rights. Alger asked Lawrence if he understood his rights, Lawrence answered "yes," wrote the word "yes" across the card and signed the card. Alger then asked Lawrence if he would be willing to answer some questions without a lawyer being present. Lawrence responded affirmatively again and signed the portion of the card acknowledging his understanding of the waiver of his *Miranda* right to have an attorney present. At that point, the questioning of Lawrence regarding the murder of Peter Reitberger began.

Alger advised Lawrence that he was identified as the gunman in a shooting that took place on Abermerle Avenue in Hempstead and that he was being charged with the crime. While he initially denied any involvement in the shooting, Lawrence soon admitted that he was in the alleyway and admitted to firing the gun that killed

Reitberger. Lawrence told Alger the following story regarding the events of November 21, 1991.

On the night of the shooting, Lawrence and Geddis left Freeport at approximately 5:30 P.M. At the time, Lawrence took with him a sawed-off shotgun in a gym bag. The pair originally intended to visit a hairstylist and friends. Later that evening, however, Lawrence and Geddis took a bus to Hempstead with the intention of committing a robbery. When they arrived at Hempstead, they met an acquaintance named "Poncho." Poncho had sold the gun in the gym bag to Lawrence and Lawrence owed Poncho money for the purchase. Lawrence told Poncho that he and Geddis were going to rob someone and he would use the money to pay Poncho for the gun.

Lawrence and Geddis proceeded to Abermerle Avenue where they came upon two Puerto Rican men (later identified as Nunez and Reitberger). Lawrence said the Puerto Ricans approached him and Geddis and asked where they could purchase crack. Lawrence directed the pair to the alley where he and Geddis proceeded to commit the robbery. Lawrence's version of the events was, essentially, identical to the version provided to police by Nunez. He admitted to robbing Reitberger of $10 and to the scuffle that ensued when Nunez and Reitberger were told to remove their pants.

Lawrence admitted to firing the gun that killed Reitberger. He explained that the shooting took place when Reitberger attempted to grab the gun. Lawrence stated that after the shooting, he and Geddis concealed the weapon under a nearby truck. They later returned to the scene to retrieve the weapon and brought it to Poncho, where it was later found by police, along with Lawrence's gym bag.

Lawrence's story was transcribed by Detective Alger into a nine page statement. Alger presented the document to Lawrence for his review. Lawrence read

the statement, out loud at first, and later to himself. Lawrence confirmed to Detective Alger that the statement as written was correct and declined to add or change anything written by Alger. During the entire interrogation by Alger, Lawrence never asked to speak with an attorney or any family members.

## II. *The Pretrial Hearing*

Prior to trial the state court held a combined *Wade, Huntley* and *Mapp* hearing to determine: (1) whether there was probable cause to arrest Lawrence based upon the photographic identification of Nunez; (2) the admissibility of Lawrence's confession and (3) the admissibility of the gun retrieved from Poncho.[1]

Detective Alger testified at the hearing regarding the scene of the crime and the version of the crime as related to him by Nunez. He further testified as to the method used for assembling the photographic array and Lawrence's waiver of his *Miranda* rights. Finally, Alger testified regarding his interrogation of Lawrence and Lawrence's agreement to Alger's transcribed statement of the events on the night of the shooting.

Lorraine Cerar, an employee of the Education Assistance Corporation ("EAC"), a company that, *inter alia*, conducts testing and offers career counseling, testified on behalf of Lawrence. Cerar testified that she had reviewed the results of academic tests administered to Lawrence when he enrolled in a GED program administered by EAC. Cerar stated that the results of Lawrence's testing revealed that his vocabulary skills were at the third grade level and his reading skills were at approximately the fourth grade level. Law-

rence's comprehension skills were assessed at approximately the sixth grade level. His spelling and "language mechanics" grades were lower, at approximately the first grade level. On cross-examination of Cerar, it was brought out that Lawrence had successfully completed the tenth grade at Hempstead High School.

The state trial court overruled all defense objections raised at the pretrial hearing. The photographic array prepared by Detective Alger was not found improperly suggestive and was therefore held to be constitutionally appropriate. The court held that Nunez's identification of Lawrence was proper and constituted probable cause for his arrest. The court also upheld the police seizure of the shotgun used to kill Reitberger.

The state court further held that Lawrence was properly advised of his *Miranda* rights and that he had knowingly, intelligently and voluntarily waived those rights. The trial judge credited the testimony of Alger regarding Lawrence's review and assent to the story as set forth in the written statement. The court found Lawrence to be competent and literate and that he fully understood the circumstances of the case as well as the waiving of his Constitutional rights. Thus, the court found Lawrence's statement admissible in its entirety.

## III. *The State Court Trial*

### A. *The Testimony*

At trial, Nunez testified regarding the events of November 21, 1991, as set forth above. Also testifying at the trial was Evelyn Collins, a resident of Abermerle Avenue who lived with Pam Curry, an

---

1. In New York State criminal procedure practice a *Huntley* hearing is held to determine the voluntary nature of a criminal defendant's statements. *People v. Huntley* 15 N.Y.2d 72, 78, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965); *see Diaz v. Senkowski*, 76 F.3d 61, 63 (2d Cir.1996). A *Mapp* hearing refers to a hearing held pursuant to *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), to determine whether a search and seizure is consistent with the Fourth Amendment to the United States Constitution. A *Wade* hearing is held pursuant to *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), to determine whether an identification procedure such as a photographic array was unduly suggestive.

acquaintance of Lawrence and Geddis. Collins testified that Lawrence and Geddis were in her apartment after the shooting. She overheard a conversation between the two in the backyard of the apartment during which Geddis told Lawrence to stuff the stolen money into his pants and called Lawrence a "dumb ass." Collins called 911 and told the police of suspicious activity in her backyard, but by the time police arrived Lawrence and Geddis had fled.

The police officer who recovered the towel in which Lawrence's gun was wrapped, along with shells from the shotgun used to murder Reitberg, also testified. A firearms examiner testified that shotgun wadding extracted from Reitberger's body was consistent with the wadding recovered from the crime scene. The medical examiner testified that Reitberger died from a single shotgun wound to his chest. Finally, Detective Alger testified at the trial, essentially repeating the testimony given at the pretrial suppression hearing.

The only witness offered at trial by Lawrence was Lorraine Cerar, who repeated her testimony offered at the pretrial hearing regarding Lawrence's low academic achievement.

### B. *The Verdict and Sentence*

The state court jury found Lawrence guilty of two counts of murder in the second degree, (intentional murder and felony murder) (N.Y.Penal L. § 125.25[1], [3]), two counts of robbery in the first degree, (causing serious injury and armed with a deadly weapon) (N.Y.Penal L. § 160.15[1], [2]), and two counts of attempted robbery in the first degree, (causing serious injury and armed with a deadly weapon) (N.Y.Penal L. § 110.00, 160.15[1], [2]).

Lawrence was thereafter sentenced to concurrent terms of imprisonment of twenty-five years to life on each of the murder counts. Lawrence received a sentence of eight and one-third to twenty-five years imprisonment on the serious injury robbery count, and a sentence of seven and

one-half to fifteen years on the attempted armed robbery count, (causing serious injury), and a sentence of five to fifteen years on the other attempted robbery count (armed with a deadly weapon). Each of these sentences were ordered to run concurrently. Lawrence also received a sentence of twelve and one-half to twenty-five years on the armed robbery count. This sentence was ordered to run consecutively with all other sentences.

### IV. *State Court Post–Trial Proceedings and Appeals*

Lawrence appealed his conviction to the Appellate Division of the Supreme Court. He raised four issues in his appeal: (1) that his confession was taken in violation of his *Miranda* rights; (2) that the photographic array presented to Nunez was unconstitutionally suggestive; (3) that the evidence presented at trial was insufficient to support his conviction, and (4) that the sentences imposed were excessive.

In an opinion dated November 4, 1996, the Appellate Division affirmed Lawrence's conviction. *People v. Lawrence*, 233 A.D.2d 343, 649 N.Y.S.2d 814 (2d Dep't.1996).

The Appellate Division held that the trial court properly refused to suppress Lawrence's statements on *Miranda* grounds. The court held that Lawrence was properly advised of his *Miranda* rights and that he waived those rights prior to making his statement. The court further held that the photographic array presented to Nunez was not unduly suggestive and it was therefore unnecessary to elicit evidence form Nunez concerning an independent source for his in-court identification. The Appellate Division dismissed Lawrence's other contentions without discussion.

Lawrence thereafter sought leave to appeal to the New York State Court of Appeals. Before that court, Lawrence raised only the *Miranda* issue. Although Lawrence wrote to the attorney representing him in the appellate process regarding all

grounds raised before the Appellate Division, the appellate lawyer counseled against raising each issue in the petition to the Court of Appeals. Specifically, Lawrence's counsel stated his belief that only the strongest argument should be put before the Court of Appeals when seeking leave to appeal. Thus, it was his advice that only the *Miranda* issue be raised to that court. Lawrence's attorney filed the petition seeking review of the *Miranda* issue with the Court of Appeals. That court denied Lawrence leave to appeal on December 30, 1996. *People v. Lawrence,* 89 N.Y.2d 925, 654 N.Y.S.2d 727, 677 N.E.2d 299 (1996).

## V.  *Federal Habeas Proceeding*

Petitioner raises three claims in this habeas proceeding. First, it is alleged that his statement to Detective Alger should have been suppressed because it was taken in violation of Petitioner's *Miranda* rights. Second, Petitioner claims that the photographic array presented to Nunez was unconstitutionally suggestive. Finally, Petitioner claims that there was insufficient evidence presented at trial to convict him of murder.

## DISCUSSION

### I.  *Alleged Miranda Violation*

#### A.  *Petitioner's Claims*

Petitioner claims that his December 6, 1991 statement was taken in violation of his Constitutional rights. It is contended that Petitioner never knowingly and intelligently waived his right to remain silent or to have an attorney present at his questioning. Petitioner relies upon his low academic scores as evidence that he never knowingly waived his *Miranda* rights. In support of this argument, Petitioner relies on the testimony of Lorraine Cerar, who testified regarding Lawrence's underachievement on reading and comprehension tests.

Petitioner also argues that the statement given to Detective Alger was obtained through "coercion and trickery." In support of this claim, Petitioner alleges that he was arrested on the street so that he would be isolated from his family. He argues that, in view of the fact that he was seventeen years old at the time of his arrest, it was incumbent upon the police officers to telephone Petitioner's family to advise them that he was in custody.

Further, Petitioner finds fault with the way in which his *Miranda* rights were explained. Specifically, Petitioner argues that it was insufficient for Alger to state that Petitioner had a right to have an attorney present "at any time." Rather, it is argued, he should have been advised that he had a right to have a lawyer present at the questioning that was then taking place.

#### B.  *Legal Principles*

■■■ A statement made during custodial interrogation is admissible against the defendant only if the statement was made voluntarily after a knowing waiver of the Fifth Amendment right against self incrimination. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). To prove a valid waiver of *Miranda* rights, the government must show: (1) that the waiver was voluntary, and (2) that defendant had a "full awareness of the right being waived and of the consequences of waiving that right." *United States v. Male Juvenile,* 121 F.3d 34, 39–40 (2d Cir.1997). Thus, a finding of a valid waiver requires both a comprehension of the rights waived and an absence of coercion—a "knowing" component and a "voluntary" component. *Id.* at 40.

■■■ A knowing relinquishment of *Miranda* rights can be found even where a defendant has only limited intellectual capacity. Thus, even a defendant who is classified as "mildly retarded" or having learning disabilities may waive his rights if he can comprehend sufficiently the particular rights set forth in *Miranda. Male Juvenile,* 121 F.3d at 40, quoting. *Toste v.*

*Lopes,* 701 F.Supp. 306, 313–14 (D.Conn. 1987), *aff'd,* 861 F.2d 782, 783 (2d Cir. 1988). The issue is whether defendant is "so incompetent that he was not aware of 'both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Male Juvenile,* 121 F.3d at 40, quoting, *Colorado v. Spring,* 479 U.S. 564, 573, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987).

■ A voluntary relinquishment of *Miranda* rights is the "product of a free and deliberate choice rather than intimidation, coercion, or deception." *Male Juvenile,* 121 F.3d at 41; *Smith v. Sullivan,* 1 F.Supp.2d 206, 213 (W.D.N.Y.1998). The relevant test is whether defendant's statement was obtained "by physical or psychological coercion or by improper inducement so that [defendant's] will was overborne." *Smith,* 1 F.Supp.2d at 213, quoting, *Derrick v. Peterson,* 924 F.2d 813, 817 (9th Cir.1990), *cert. denied,* 502 U.S. 853, 112 S.Ct. 161, 116 L.Ed.2d 126 (1991).

■ A claim that a statement was given in the absence of a valid waiver is evaluated under a "totality of the circumstances" approach. *Diaz v. Senkowski,* 76 F.3d 61, 65 (2d Cir.1996). Factors to be considered include "the type and length of questioning, the defendant's physical and mental capabilities, and the governing method of interrogation." *Id.,* quoting, *United States v. Okwumabua,* 828 F.2d 950, 953 (2d Cir. 1987). "Only if the totality of the circumstances 'reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.'" *Male Juvenile,* 121 F.3d at 40, quoting, *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

■ Where, as here, a state court has adjudicated the merits of petitioner's claim, the federal habeas corpus statute, the Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") states that relief may not be granted unless: (1) the state court decision was "contrary to, or·

involved an unreasonable application of, clearly established Federal law . . ." or (2) the state court decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Both AEDPA and its predecessor statue recognize the presumption of correctness to be applied to state court findings of fact. *See* 28 U.S.C. § 2254(e)(1); *Whitaker v. Meachum,* 123 F.3d 714, 715 n. 1 (2d Cir.1997). AEDPA, however, adds an additional burden to the habeas petitioner, requiring "clear and convincing" evidence to effectively rebut the presumption of correctness. 28 U.S.C. § 2254(e)(1); *see Smith v. Sullivan,* 1 F.Supp.2d 206, 210 (W.D.N.Y.1998). "The touchstone for a reasonable determination is 'whether the determination is at least minimally consistent with the facts and circumstances of the case.'" *Sellan v. Kuhlman,* 1999 WL 711495 *5 (E.D.N.Y. 1999), quoting, *Hennon v. Cooper,* 109 F.3d 330, 335 (7th Cir.), *cert, denied,* 522 U.S. 819, 118 S.Ct. 72, 139 L.Ed.2d 32 (1997).

### C. *There Was No Miranda Violation*

Here, as noted, Petitioner takes issue with both the knowing and voluntary nature of the waiver of his *Miranda* rights. The totality of the circumstances, as revealed in the state court record, supports neither argument. Thus, upon consideration of the state court record, this court cannot say that the state court decision that was based on an unreasonable determination of the facts, 28 U.S.C. § 2254(d), or that the presumption of the correctness of state court factual findings has been rebutted by the introduction of "clear and convincing" evidence. 28 U.S.C. § 2254(e)(1).

With respect to the "knowing" aspect of the waiver, Petitioner relies here, as he did in state court, on his low academic achievement. The state court heard the testimony of Detective Alger and Ms. Cerar on this issue and its finding is entitled to

great weight. As conveyed by the testimony of Detective Alger, Petitioner was advised of his *Miranda* rights when they were read by Alger from a "*Miranda* card." The card was shown to Lawrence who read it, stated that he understood his rights, wrote the word "yes" across the card and signed it. Petitioner also signed the portion of the card acknowledging his understanding of the waiver of his *Miranda* right to have an attorney present. Petitioner read his transcribed statement and confirmed to Detective Alger that the statement was correct.

■ The evidence provided by Ms. Cerar, while tending to show that Petitioner performed poorly on certain standardized language tests, did not dictate a finding that Petitioner did not understand his *Miranda* rights. While the evidence may have supported a finding that defendant had learning disabilities, nothing in the record indicated "that defendant could not comprehend the rights that were explained and read to him." *Male Juvenile*, 121 F.3d at 40. In short, this court agrees with the holding that Petitioner knowingly waived his *Miranda* rights and finds that Petitioner has come forward with no real rebuttal of any factual findings underpinning that decision.

Even less convincing is Petitioner's argument that his statement to Detective Alger was the product of coercion. Evidence of coercion is lacking from both the state court record and the record before this court. Indeed, the only "evidence" of coercion is Petitioner's unsupported argument that such coercion existed. There is no evidence that the type and length of questioning or the method of interrogation created an environment where it can be said that Petitioner's statement was the product of coercion, rather than the product of free choice.

■ Detective Alger's testimony, accepted by the trial court, established that he did not order that Petitioner's arrest be made only outside of the presence of his family. Notably, during the entire interrogation, Petitioner never asked to speak with an attorney or any family members. In fact, it was Alger who suggested to Petitioner that he call his mother. Nor does Petitioner's age, standing alone, render his statement obtained through coercion. Like intellectual capacity, age is only one factor to consider in the "totality of the circumstances" inquiry. *See Smith*, 1 F.Supp.2d at 215. There is no evidence that Petitioner was of such a tender age as to render his statement obtained by coercion. Indeed, confessions obtained from younger individuals have been upheld under a totality of the circumstances review. *See Smith*, 1 F.Supp.2d at 215 (upholding confession of a thirteen year old defendant). In sum, this court finds no evidence tending to show that Petitioner's statement was the product of coercion and agrees with the state court that the statement to Detective Alger was given voluntarily as well as knowingly.

■ Finally, the court rejects Petitioner's argument that his *Miranda* rights were not properly conveyed because the notice to have an attorney present "at any time," was insufficient to apprise Petitioner of the right to have an attorney present during questioning. *Miranda* warnings are not reviewed "for whether they adhered to a certain form, but for their substance." *Avincola v. Stinson*, 60 F.Supp.2d 133, 158 (S.D.N.Y.1999), quoting, *United States v. Anderson*, 929 F.2d 96, 98 (2d Cir.1991). It is necessary only that *Miranda* rights be conveyed to defendant in an "intelligible fashion." *Id.* Thus, the issue is whether the statement of rights provided to Petitioner "touched all of the bases required by *Miranda*" and was sufficient to reasonably inform defendant of his *Miranda* rights. *Avincola v. Stinson*, 1999 WL 557965 *23 (S.D.N.Y. 1999), quoting, *Duckworth v. Eagan*, 492 U.S. 195, 203, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989); *see also Smith*, 1 F.Supp.2d at 213 (fact that warning "varied in some ways from the precise language of *Miranda* is in itself of no moment").

**538**

■ Upon review of the warnings provided to Petitioner, the court holds that his *Miranda* rights were adequately conveyed. There is no requirement that any particular words be used. The statement that Petitioner had a right to have an attorney present "at any time" was adequate to convey the notion that he had a right to have counsel present at the time of questioning. Accordingly, the court declines to hold that the *Miranda* warnings provided to Petitioner were in any way inadequate to convey his constitutional rights.

## II. *Suggestibility of Photographic Array and Insufficiency of the Evidence*

### A. *Exhaustion*

Before turning to the merits of Petitioner's final two claims, the court notes that neither claim was raised in the letter seeking leave to appeal to the New York Court of Appeals. Instead, these grounds were abandoned, on advice of counsel, after being rejected by the Appellate Division. As noted, counsel expressed the belief that the weakness of these grounds took away from the possibility that the high court would grant further appellate review. Thus, the suggestibility of the photographic array and the sufficiency of the evidence claims were never exhausted in the state system.

Generally, an application for habeas corpus relief may not be entertained unless petitioner has exhausted all remedies available in the state court. 28 U.S.C. § 2254(b)(A). Exhaustion is not required of "there is an absence of available State corrective process; or circumstances exist that render such process ineffective to protect the rights" of the petitioner. 28 U.S.C. § 2254(b)(1)(B)(i)(ii). District courts have the discretion, however, to consider, and deny, any unexhausted claim. 28 U.S.C. § 2254(b)(2). *See Orraca v. Walker*, 53 F.Supp.2d 605, 610–11 (S.D.N.Y.1999).

■ Respondent argues, and this court agrees, that the two claims not presented for review to the Court of Appeals should be deemed exhausted because they are now procedurally barred from any further state court review. N.Y.C.R.R. § 500.10(a) (permitting only a single application for leave to appeal to New York Court of Appeals); *see Durden v. Garvin*, 1998 WL 903597 *4–5 (E.D.N.Y.1998) (where petitioner failed to raise claim before New York Court of Appeals he is barred, under New York State practice, from returning to that court to again seek review); *Redd v. Quinones*, 1998 WL 702334 *3 (S.D.N.Y.1998) (same).

■ The procedural bar to further state court review, while leading to a finding of exhaustion, may also result in forfeiture of federal habeas review of the claim. Forfeiture occurs unless petitioner can prove cause for the procedural default as well as prejudice resulting therefrom, or that a miscarriage of justice would result from the failure of the federal court to review the claim. *See Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Reyes v. Keane*, 118 F.3d 136, 138 (2d Cir.1997); *Almanzar v. Portuondo*, 1999 WL 557517 *5 (E.D.N.Y. 1999); *Durden v. Garvin*, 1998 WL 903597 *5 (E.D.N.Y.1998); *Redd v. Quinones*, 1998 WL 702334, at *3 (S.D.N.Y.1998).

■ "Cause" for a procedural default exists "if the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), Circumstances justifying a finding of "cause" include a claim that the procedural default was the result of the ineffective assistance of counsel. *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir.1994), quoting, *Murray*, 477 U.S. at 488, 106 S.Ct. 2639; *Redd v. Quinones*, 1998 WL 702334, at *3 (S.D.N.Y. 1998); *Metts v. Miller*, 995 F.Supp. 283, 294 (E.D.N.Y.1997).

■ Once cause for a procedural default is found, a habeas petitioner must also show prejudice resulting therefrom, or satisfy the "miscarriage of justice" test.

With respect to prejudice, petitioner must show not only a "possibility" of prejudice, but that "the errors at his trial ... worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Metts,* 995 F.Supp. at 295, quoting, *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). *See also Almanzar v. Portuondo,* 1999 WL 557517 *5 (E.D.N.Y.1999). A miscarriage of justice is deemed to arise only in the most "extraordinary" case, *Metts,* 995 F.Supp. at 295, and is present only if the constitutional error likely resulted in the conviction of an innocent man, *Reyes,* 118 F.3d at 138; *Almanzar v. Portuondo,* 1999 WL 557517 *5 (E.D.N.Y.1999). The miscarriage of justice exception applies only if the habeas petitioner accompanies his showing of a constitutional violation with a colorable claim of innocence. *Metts,* 995 F.Supp. at 296.

■ Where "cause" for a procedural default rests on a claim of ineffective assistance of counsel, petitioner must show that counsel's deficient performance was "so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see Avincola v. Stinson,* 60 F.Supp.2d 133, 145 (S.D.N.Y.1999) (showing of ineffective assistance of counsel for showing cause of procedural default is same as showing required to show ineffective assistance of counsel as an independent ground raised in habeas petition). The standard for assessing counsel's performance is an objective standard of reasonableness. *Id.* at 688, 104 S.Ct. 2052.

■ In addition to setting the standard for effective representation of trial counsel, *Strickland v. Washington* sets the standard for effective assistance of appellate counsel. *See, e.g., Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.), *cert. denied,* 513 U.S. 820, 115 S.Ct. 81, 130 L.Ed.2d 35 (1994). Such counsel is not required to raise each and every issue and each and every appellate level. Instead, it is reasonable for appellate counsel to focus on stronger arguments. It is not the province of the habeas court to "second guess the reasonable professional judgments of appellate counsel as to the most promising appeal issues." *Avincola v. Stinson,* 1999 WL 557965 * 12 (S.D.N.Y.1999); *see Jones v. Barnes,* 463 U.S. 745, 754, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). Appellate counsel's failure to raise certain issues can only amount to ineffective assistance of counsel if "significant and obvious" issues were abandoned while "clearly and significant weaker" issues were pursued. *Mayo v. Henderson,* 13 F.3d at 533.

■ Applying the above-referenced principals, the court holds that no cause exists to excuse Petitioner's procedural default of failing to present his final two claims to the New York Court of Appeals. The reason that appellate counsel failed to raise these issues to the high court are set forth clearly in correspondence between counsel and client. In a clear and articulate letter dated November 19, 1996, after receiving notice of the Appellate Division's denial of his appeal, Petitioner wrote to his attorney discussing the strategy for further appeal. He inquired as to the attorney's thoughts regarding the *Miranda* issue as well as the photographic array and the other issues deemed by the Appellate Division to have been without merit. Counsel responded, in a letter dated November 21, 1996, by stating that "the best strategy is to choose the strongest issue, constitutional issues being the best, to argue why the case merits a second look, this one by New York State's highest court." There was no further correspondence from Petitioner regarding the request for leave to appeal to the Court of Appeals.

It is well within the discretion of reasonable appellate counsel to put only what is perceived to be the strongest issue forward when seeking review by the New York Court of Appeals. Because such review is discretionary, it is reasonable for counsel to conclude that the court will review only issues of constitutional magnitude where the facts are compelling. It is

540

equally reasonable for counsel to make the request concise and clear and not clutter the petition with grounds that are neither likely to succeed on the merits nor capture the attention of the high court.

Under the circumstances here, this court will not "second guess" the conclusion of counsel "as to the most promising appeal issues." *Avincola v. Stinson,* 1999 WL 557965 * 12 (S.D.N.Y.1999). Nor will the court find that counsel abandoned "significant and obvious" issues while pursuing "clearly and significantly weaker" issues. *Mayo v. Henderson,* 13 F.3d at 533. Accordingly, the court cannot agree that the failure to raise all issues to the Court of Appeals constitutes ineffective assistance of counsel so as to constitute cause for Petitioner's procedural default. Because the court finds an absence of cause for Petitioner's procedural default, the court need go no further and declines to consider the merits of the claims relating to the photographic array and insufficiency of the evidence.

█ Even if the court were to consider those claims, however, they, like the *Miranda* claim, would be subject to AEDPA's stringent standard of review. *Dingle v. Scully,* 1990 WL 252285 *6 (E.D.N.Y. 1990). Like the *Miranda* claim, the claim regarding the photographic array was fully considered by the state court at the pretrial hearing. That court's finding that the array was not suggestive was reviewed, discussed and affirmed by the Appellate Division. This court has reviewed that transcript and the photographic array and agrees fully that the array was in no way suggestive. Where, as here, a photographic array is not suggestive, a subsequent in-court identification is not deemed tainted and there is no due process violation. *See Sims v. Sullivan,* 867 F.2d 142, 145–46 (2d Cir.1989); *United States v. Santos,* 1991 WL 254549 *4 (S.D.N.Y. 1991). Accordingly, even if Petitioner had not procedurally defaulted on his claim that the photographic array was improperly suggestive, this court would nonetheless reject the claim on the merits.

█ Additionally, were this court to reach the merits of the sufficiency of the evidence claim, that claim too, would be rejected. A claim of insufficient evidence to convict will be upheld only if after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 309, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The record in this case, including the testimony of police officers and witnesses to the crimes, amply supports Petitioner's convictions of the crimes with which he was charged.

### CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is denied. The Clerk of the Court is directed to close this case.

SO ORDERED.